## GULATH v. CITY OF ST. LOUIS, Appellant.

### Division One, December 23, 1903.

1. **Sewer**: OVERFLOW: ACT OF GOD: UNPRECEDENTED RAIN. Where the sewer is amply sufficient to meet the demands upon it under ordinary conditions, the owner of property can not recover from the city damages for injury thereto caused by the overflow from the sewer at a time of unusual and extraordinary rainstorm; for in that case the injury arose from the act of God. And where the evidence shows a rainfall of 2.56 inches in sixty-two minutes and of 5.10 inches in twenty-four hours, that such rainfall was the greatest of which there is any record known to the Signal Service, that the sewer was built with a capacity to carry a rainfall of one inch per hour from all the territory it was constructed to drain, that constructed with that capacity it afforded a more ample drainage than had before the building of the sewer been afforded by nature, and that at all other times for many years, except on one or two occasions when there were other extraordinary floods, the sewer was amply sufficient to carry off all the water, the overflow can not be charged to any breach of the city's duty to its inhabitants or to any act of municipal negligence.

2. ———: ———: CONSTITUTIONAL PROVISIONS. The constitutional provision that "private property shall not be taken or damaged for public use without just compensation" has no application to a suit against the city for damages to the goods of a storekeeper which were injured by the overflow of a sewer. In such case if the storekeeper recovers, it must be on the ground of negligence, and not as for the taking or damaging of private property for a public use.

Appeal from St. Louis County Circuit Court.— *Hon. Jno. W. McElhinney,* Judge.

REVERSED.

*Chas. W. Bates* and *Wm. F. Woerner* for appellant.

(1)   The establishment of a general drainage system, and the determination of when and where sewers should be constructed, and of what size, capacity and material are matters that have always, under the city charter, been entrusted for determination to the legislative branch of the municipality.   Charter St. Louis 1901, art. 6, sec. 20 et seq; Scheme and Charter set out in R. S. 1899, p. 2512; Act of March 14, 1861, sec. 14, p. 215; set forth in R. O. 1861, p. 290, under "Sewers," charter R. O. 1866, p. 209, ch. 8; 27 Mo. App. 485; 159 Mo. 45; 170 Mo. 451.   In pursuance of, and in accordance with such ordinances, enacted in good faith, and as directed by the charter, were built Mill Creek sewer (a public sewer) and its various extensions and tributaries.   In enacting them the municipal authorities performed duties of quasi-judicial, or rather legislative, nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health, public finances, and general public convenience, throughout an extensive territory.   It is not the legitimate province of a jury, influenced by such evidence as may happen to come before it, or perhaps other considerations peculiar to an individual lawsuit, to sit in review upon the wisdom or judiciousness of such deliberate enactments of a legislative body.   A jury's province is to determine the questions of fact whether the ministerial duty of executing the work called for by the ordinance provisions, or of maintaining the sewer in proper condition and repair, has been properly or negligently performed.   But for a mere error of judgment on the part of the legislative body, resulting either in the construction of what develops to be a sewer of inadequate size and capacity, but built as provided by the ordinance, or in non-action or failure to enact new ordinances enlarging the capacity of a sewer to meet a greater volume of water on account of changed conditions, the

city can not be held to answer in damages to a private suitor. Steinmeyer v. St. Louis, 3 Mo. App. 256; Hession v. Wilmington (Del.), 27 Atl. 830; s. c., 40 Atl. 749; s. c., 1 Marvel 122; Carr v. Northern Liberties, 35 Pa. St. 324; Johnston v. District of Columbia, 118 U. S. 19; Furniture Co. v. Davenport, 99 Ia. 589; Mills v. Brooklyn, 32 N. Y. 489; Bealafield v. Verona, 188 Pa. St. 627; Fair v. Philadelphia, 88 Pa. St. 311; Collins v. Philadelphia, 93 Pa. St. 272; Springfield v. Spence, 39 Ohio St. 669; 10 Am. and Eng. Enc. Law (2 Ed.), pp. 240-242; Chicago v. Seben, 165 Ill. 371; Lansing v. Toolan, 37 Mich. 152; Childs v. Boston, 4 Allen 51; Willett v. St. Albans, 69 Vt. 330; Foster v. St. Louis, 71 Mo. 157; Stewart v. City, 79 Mo. 611; St. Louis v. Gurno, 12 Mo. 414. (This case was disapproved in 51 Mo. 510, but its doctrine was reaffirmed in 55 Mo. 127, 79 Mo. 612, 107 Mo. 88, 120 Mo. 116, 3 Mo. App. 261, 86 Mo. 419; Donahoe v. Kansas City, 136 Mo. 666 (recognizing liability for ministerial delinquency, but quoting from Jones on Neg. Mun. Corp. and Johnston v. Columbia, supra, to the effect that there is none for error in determining the "expediency of doing the work, and the general manner in which it shall be done." (2) No negligence was proved. On the contrary, the evidence negatived its existence. (a) The plans and capacity of the sewer and its extensions and tributaries were devised by competent and skilled engineers, acting on well recognized engineering principles, and upon these in the utmost good faith, the ordinances were based. Even in States holding the city to the strictest liability for faulty plans, the cases recognize that there must have been culpable inattention, or negligence, which is the basis of the liability. Terre Haute v. Hudnutt, 112 Ind. 544; Uppington v. New York, 165 N. Y. 222. (b) Neither was there any negligence in not having enlarged Mill Creek sewer, or sooner provided for its relief. As soon as the authorities were aware

of its supposed inadequacy, relief was contemplated by Tower Grove storm sewer.  (c)  An occasional, accidental or temporary damage to property, such as may be caused by a remediable overflow of a sewer, is not the taking or damaging of property for public use contemplated by section 21 of article 2 of the Missouri Constitution.  The damage must be the result of a direct encroachment upon plaintiff's property; not consequential damages.  There must be substantially a permanent depreciation in value.  There was no such evidence; nor did the plaintiff proceed on any such theory.  Bear v. Allentown, 148 Pa. St. 80; Uppington v. New York, 165 N. Y. 228; Henderson v. Minneapolis, 32 Minn. 319; Railroad v. Knapp, Stout & Co. Co., 160 Mo. 411; Van De Vere v. Kansas City, 107 Mo. 83; Payne v. Railroad, 112 Mo. 6.  (d)  The uncontradicted evidence showed that the position of plaintiff was rendered no worse by the building of the sewer.  His premises are in the lowest point of a basin in Mill Creek valley.  The point had before the construction of any sewer, and while in its natural condition, frequently been overflowed—oftener, and to a much greater extent, than any time thereafter. The sewer (as required by the charter) was built along the natural watercourse, and carried off a greater volume of water than the old course carried; no overflow took place for thirty-five years after its construction. The plaintiff is certainly no worse off than if it had not been built at all.  All the authorities, even those announcing the strictest liability, recognize expressly or impliedly that unless there is damage by water or sewage which would not have otherwise found its way there, there can be no recovery.  Tate v. St. Paul, 56 Minn. 527; Furniture Co. v. Davenport, 99 Ia. 593; Achisson v. Challiss, 9 Kan. 613.  (e)  The plaintiff would have suffered the same damages whether there had been the negligence alleged by him or not.  The rainfall was so phenomenal (being by far the heaviest ever recorded in the history of the St. Louis weather bureau) that no

sewer ever built could have carried it off. Where the rainfall is so excessive that in the absence of any negligence the damage would still have occurred, the city is excused from liability even if negligent. Brash v. St. Louis, 161 Mo. 440; American Brewing Ass'n v. Talbot, 141 Mo. 674.

*Alfred A. Paxson* for respondent.

(1) The first point is that a municipality is not liable in damages, if they were occasioned by reason of the inadequate size and capacity of the sewer. All the Missouri authorities cited by appellant on this proposition prior to 79 Mo. have been superseded and made inapplicable by the constitutional amendment of 1875. And this court says in the Hickman case, 120 Mo. 116: "To uproot this doctrine and provide for compensation where property is damaged, as well as where it is taken for public use, the eminent domain clause of the Constitution of 1865 was amended by the Constitution of 1875, to read as quoted, and since it has been considered as the settled law in this State, that when property is damaged by establishing the grade of a street, or by raising or lowering the grade of a street previously established, it is damaged for public use within the meaning of the Constitution. 78 Mo. 107; 89 Mo. 34; 83 Mo. 488; 94 Mo. 574; 115 Mo. 258." And this doctrine is reaffirmed in Railroad v. Knapp, Stout & Co. Co., 160 Mo. 413. The contention of the defendant is that the duties of the municipal authorities in adopting a general plan of drainage and in determining when and where, and of what size sewers are to be built, are of a quasi-judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the health and general needs of the community; and the exercise of such judgment in the selection of a general plan of drainage, or in determining the size and sufficiency of sewers, is not subject to revision by a court or jury. The general proposition contended for

by the city is subject to several qualifications. (a) Thus, where the effect of the sewer, whatever its plan, is to cause a direct invasion of private property by collecting and throwing upon it, in new channels or in increased quantities, water which would not otherwise have found its way there, the corporation is liable. Seifert v. Brooklyn, 101 N. Y. 136; Edmonson v. Moberly, 98 Mo. 526; Carson v. City, 53 Mo. App. 289; Tate v. St. Paul, 56 Minn. 527; Lehn v. San Francisco, 66 Cal. 76; King v. Kansas City, 58 Kan. 338; North Vernon v. Vegelar, 89 Ind. 77; Reid v. Atlanta, 73 Ga. 523; Winn v. Rutland, 52 Vt. 481; Rychlicki v. City, 98 Mo. 497; Mining Co. v. Joplin, 124 Mo. 136; Dillon on Munic. Corp., secs. 1047-1051a; Sanford v. San Francisco, 111 Cal. 198; City of Aurora v. Reid, 57 Ill. 29; Field v. West Orange, 36 N. Y. Eq. 527; Pye v. City of Mankato, 36 Minn. 373; Arn v. Kansas City, 14 Fed. 236. The proposition that a city can, by virtue of its power to construct sewers in the exercise of its discretion, so plan the system that it may with impunity throw the sewage upon the lands of adjacent owners, is so iniquitous and unjust as to be abhorrent to the sense of justice of every intelligent mind. Neither the Legislature of the State nor any action on the part of the city can authorize a public use, the natural result of which is to injure the property of its citizens. Seifert v. Brooklyn, 101 N. Y. 136; Smith v. City of Sedalia, 53 S. W. 911; Inman v. Tripp, 11 R. I. 520; King v. Kansas City, 58 Kan. 334; Tate v. St. Paul, 56 Minn. 527; Ashley v. Port Huron, 53 Mich. 301; Rhodes v. Cleveland, 10 Ohio 160; Pettigree v. Village, 25 Wis. 223; Pompelly v. Green Bay, 13 Wall. 166. (b) Again, where the necessity for drainage is occasioned by the act of the corporation itself, the rule exempting the municipality from liability for failure to supply sewers does not apply. Sanford v. San Francisco, 111 Cal. 198; Ashley v. Port Huron, 35 Mich. 152; Defer v. Detroit, 67 Mich. 346; King v. Granger, 14 Atl. 1012; City of Evanston v. Deeker, 84

Ind. 325; Wood, Law of Nuisance, p. 752. Where public sewers as originally planned, or as extended, are insufficient in size and by reason thereof under ordinary conditions, result in overflowing the property of adjoining and connecting owners, and such injury is liable to be repeated and continuous, it is remediable by a change of plan or the adoption of prudent measures; the city, after notice of such insufficiency or such time as notice would be imputed to it, is liable for omission to use ordinary care to remedy the evil. Sanford v. San Francisco, 111 Cal. 198; Seifert v. Brooklyn, 101 N. Y. 142; City of Aurora v. Reed, 57 Ill. 29; Tate v. St. Paul, 56 Minn. 527; Inman v. Tripp, 11 R. I. 520; Wood, Law of Nuisance, par. 752; Peck v. City of Michigan, 149 Ind. 676; Dillon, Munic. Corp., par. 1051; City of Evanston v. Doeker, 84 Ind. 325. (2) Appellant's second point is that no negligence was proved. This assignment has made it necessary for respondent to print his entire testimony, and it takes but a casual reading of the same to convince the unbiased mind that it would have been palpable error for the lower court to have taken the case from the jury. As to the excessive nature of the rain that fell on the night of the overflow in question, it is only necessary to say that that fact was submitted under proper instructions to the jury, and they either found that the rainfall had not been proven to have been excessive in the neighborhood of plaintiff's property, or, if proven, a human agency co-operated therewith to cause the damage, and in either case, the defendant would be liable. This issue was fairly presented and all of the instructions asked by defendant on it were given and it was purely a question of fact, with ample evidence to sustain the finding of the jury, and under the well-established rule, the verdict can not be disturbed on that ground. Peoria v. Eisler, 62 Ill. App. 29; 1 Am. and Eng. Ency. of Law, title, "Act of God;" Wolf v. Am. Exp. Co., 43 Mo. 421; Vail v. Railroad, 63 Mo. 230; Pru-

itt v. Railroad, 62 Mo. 343; Strouss v. Railroad, 17 Fed. 209.

MARSHALL, J.—This is an action for two thousand dollars damages, alleged to have been caused to the premises. of the plaintiff, numbers 2734-2748, Chouteau avenue, in the city of St. Louis, and to the stock of furniture, goods, etc., therein, by an overflow of the Mill Creek sewer, on July 8, 1898. The plaintiff recovered judgment in the circuit court, for the amount claimed, and the defendant appealed.

The petition sets out the plaintiff's ownership of the premises and personal property aforesaid, and then alleges that the defendant constructed the Mill Creek sewer from Ohio avenue westwardly for several blocks under LaSalle street and Chouteau avenue, near the plaintiff's property, and connected it with the portion of said sewer running eastwardly to the Mississippi river, and required property owners in the district to be drained thereby to connect with the same or its laterals, and that it thereby became bound to keep and maintain the sewer in good order, so that plaintiff's property would be free from danger or injury on account of said sewer or the use thereof; that the sewer was provided with openings, at or near the street crossings to admit and carry off surface waters.

The petition then contains the following statement of the plaintiff's claim:

"The said Mill Creek sewer was constructed by defendant with a wooden bottom, composed of timbers and logs laid crosswise; and said defendant wholly neglected to keep same in proper repair, but carelessly, negligently and knowingly, permitted said timbers and logs to bulge and project up from the bottom of said sewer, which caused the sides and top of said sewer to crack and become displaced, and placed and permitted large stones, a large iron wagon box and other articles to be and remain in said sewer in

places therein, between California and Montrose avenues, under said LaSalle street, which with the bulging and projection of said bottom as aforesaid, formed obstructions to the passage of the water and sewage which said sewer was designed and intended to carry off to said river, and caused said sewer in case of ordinary heavy rains, to choke and dam up the flow through same and to back up the contents thereof out through said openings, flooding the streets and adjacent property for long distances, all of which was well known to defendant long before the 8th day of July, A. D. 1898, or by the exercise of reasonable care and diligence would have been known by defendant.

"That the defendant prior to last-mentioned date and since the original construction of said Mill Creek sewer, extended said sewer and constructed a large number of public and district sewers and permitted a large number of private sewers to be constructed, and caused the same to be connected with, and empty into said Mill Creek sewer; and thus caused said Mill Creek sewer to drain a large territory of over 6,500 acres of land, which was more than double the capacity of said sewer to carry off in case of ordinary heavy rainfalls, all of which was well known to defendant for several years before the 8th day of July, A. D. 1898.

"That on many times before and more particularly, on or about the 8th day of July, A. D. 1897, plaintiff and others notified defendant, its officers, and agents, of the condition and insufficiency of said sewer, and damage and danger the same were causing and liable to cause to plaintiff's property, and prayed an abatement thereof; which petition and prayer were ignored and no action taken thereon by defendant in anywise for plaintiff's protection and relief.

"That on said 8th day of July, 1898, there was a heavy rainfall in said city, such as had previously frequently occurred, and by reason of said sewer being out.

of repair, and obstructed as aforesaid and by reason of the insufficiency of said sewer as aforesaid, the water and sewage in said sewer was backed and forced through said openings in such large quantities as to flood the streets and force its way and come into and flood the plaintiff's said property, greatly damaging and ruining same.'' etc.

The answer is a general denial, with the following special defense:

''Further answering, the defendant avers that Mill Creek sewer is, and for many years last past has been, a main public sewer of the city of St. Louis, and extends for a distance of five miles or more from a point in the western part of the city in a generally eastwardly direction to the Mississippi river, into which the water and sewerage of said sewer are discharged at a point a short distance south of Chouteau avenue. And defendant avers that said sewer is one of the largest sewers in the world, and on July 7th and 8th, 1898, was a safe sewer and fully adapted to carry off all surface water, sewage and other matter properly within said sewer, or which, according to the rules of experience in the building of sewers, could reasonably or properly be expected or anticipated; and said sewer was at said time well adapted for the uses for which it was constructed and maintained.

''The defendant avers that on the 7th and 8th days of July, and especially on the night between said 7th and 8th days of July, 1898, there was a great and unusual, and extraordinary and unprecedented rainfall, and such a rainfall as had never before occurred in said city of St. Louis, and the rain water and surface water from the streets and ground rushed down the hills from the higher ground to the low ground in which plaintiff's premises were located and gathered in the streets and in said low ground near and about the said premises of plaintiff in such an unusual and unprecedented quantity that the said water formed a flood which flowed

along the streets and ran in upon the adjacent streets and ground in the neighborhood and upon the adjoining property.''

The trial developed the facts to be as follows:

Mill Creek sewer is one of the largest (if not the largest) and best constructed sewers in the world. It is a public sewer and runs along a natural watershed. It is substantially the original creek—called Mill Creek—converted into a sewer. It drains a large area—about 6,400 acres—just as the original creek did. The city began to construct it in 1864, and has extended the construction by sections, westwardly from time to time as the public revenues permitted. The last work of extension was completed in May, 1891, and the sewer as thus constructed begins at the west bank of the Mississippi river and extends westwardly for about five miles and ends at a point on Whittier street at a point 330 feet north of Lindell avenue. The sewer is sixteen by twenty feet at its mouth and gradually diminishes in size until it is ten feet in diameter at its western terminus. Its drainage capacity is 3,340 cubic feet per second, in the portion near the plaintiff's premises. It has a capacity for carrying off a rainfall of one inch an hour, which was the maximum capacity then required by experienced engineers throughout the country, and upon which basis the sewers of other cities were built. Its cost was $1,-495,482.74. It was originally built by laying a bottom of timbers about a foot square and twenty-nine feet long, close together. The walls were four feet and eight inches thick and rested on the timbers. It had an arched top eight or ten feet in radius, and two feet thick. It was shown that the section of the sewer near the plaintiff's premises was completed in 1874 and 1875. Between November, 1881, and May, 1898, the city expended for the re-construction and repair of this sewer the sum of $227,328.77.

In the latter part of the year 1896 a crack and ''subsidence'' was discovered in the sewer at Fourteenth and

Gratiot streets (which was about fourteen blocks east of the plaintiff's premises.) An examination showed that it was caused by the side walls of the sewer settling, which caused the timbers to bulge up in the center from an inch to a foot. As soon as this was ascertained, an emergency was declared by the Board of Public Improvements, and a contract for the work was immediately let, and the timbers were taken out from the bottom of the sewer where this bulging condition appeared, and an inverse concrete foundation was put in, and the side walls rebuilt where they were in a collapsed condition. This work was completed by April, 1898 and an inspection of the sewer at that time showed it to be in good condition and repair; there were no cracks in it, there was no bulging of the timbers that would have any appreciable effect upon the drainage capacity of the sewer, it was not unusually choked up (of course there was dirt and filth in it, and one witness found a loose stone in it about two feet in diameter), and it did not need any repairs at that time in the opinion of the engineers who went through it and inspected it.

The plaintiff's premises were located at, perhaps, the lowest point of the area naturally drained by the Mill Creek, and later drained by this sewer. The testimony of persons who had lived in that neighborhood for over forty years was that before the sewer was constructed the land (including plaintiff's premises) was overflowed by the creek many times. The testimony further shows that after the sewer was constructed there were three or four overflows, one was on a Sunday in May, 1897, another on the night of the cyclone in 1896, and the third on July 8, 1898. The date of the fourth is not disclosed.

The United States signal officer testified that the records of his office showed that the greatest rainfalls in St. Louis were as follows: On May 27, 1896, the day of the great cyclone, the fall was 2.23 inches, of which 1.33

was the greatest in one hour; on July 17, 1893, the fall was .96 of an inch in twenty-four hours; on March 4, 1897, there was a fall of 1.02 inches in twenty-four hours; on March 5, 1897, there was a fall of 2.31 inches in twenty-four hours, the greatest being 1.23 inches in an hour. On July 8, 1898 (the day of the overflow complained of in this case), there was a maximum rainfall of one inch in ten minutes and in one hour there was a rainfall of nearly three inches, to-wit, 2.56 inches in sixty-two minutes, and during a period of two hours there was a fall of 3.89 inches, and in twenty-four hours there was a fall of 5.10 inches. He also testified that on July 7th, there was a rainfall of nearly two inches in twenty-four hours. He further testified there never was any rainfall that equalled that of July 8, 1898. He also testified that a rainfall of an inch an hour, or two and a half inches in twenty-four hours, is considered excessively heavy.

It further appeared that on July 8, 1898, the sewer overflowed, the tops were lifted off the manholes, the water spouted up as much as ten feet into the air, the lowlands, including the plaintiff's premises, were overflowed, the cellars of the houses were filled with water, and in some places the water stood several feet deep on the first floors of the houses, the streets were covered with water to a depth of from a few inches to waist deep, and the houses were damaged and the goods injured, and a deposit of filth and slime, which was very offensive to the smell and injurious to property, was left. The overflow lasted only a few hours after the rain ceased, and after that the usual conditions were restored, and the sewer proved adequate to efficiently carry off the surface waters and the sewage, as was ordinarily the case.

At the close of the plaintiff's case and again at the close of the whole case, the defendant demurred to the evidence, but the court overruled the demurrer and the defendant saved proper exceptions. In the view herein-

after taken of this case it is not necessary to set out or consider the various instructions given or refused. As stated, the defendant appeals from a verdict in favor of the plaintiff.

## I.

The plaintiff predicates a right to recover upon two grounds: first, that the defendant was negligent in not keeping the sewer in repair, but permitted it to become racked, and the timbers on the bottom to bulge up, and allowed stones and other obstructions to accumulate in it, so that its capacity was diminished; and, second, that the sewer was inadequate and insufficient to drain the territory connected with it, and therefore it overflowed.

The first ground is unsupported by any substantial evidence. The crack or "subsidence," that is referred to in the evidence, occurred in 1896, nearly two years before the injury complained of, and was at Fourteenth and Gratiot streets, which is nearly fourteen blocks east of plaintiff's premises, and was promptly remedied, as emergency work by the city, and was completed in April, 1898, about three months before the accident, and therefore had no possible bearing upon this case.

The testimony shows that some of the bottom timbers had bulged up from an inch to a foot, but all the experts called by both the plaintiff and the defendant, said that it had no appreciable effect upon the capacity of the sewer, and could not have caused the injury complained of. One of the plaintiff's witnesses testified that he found a stone about two feet in diameter in the sewer, and that some sand and filth had banked around it. But no one pretended to say, for it would have been palpably absurd for any one to so say, that this had any effect upon this case, or that the accident would not have occurred if this stone had not been there, and the physical facts show that such effect of the stone was impossible.

The evidence also shows that the engineers thoroughly examined the sewer only a short time before the accident and found it in good condition, and not in need of any repairs.

Hence, no further attention need be given to the first ground relied upon by the plaintiff.

The learned counsel have devoted the bulk of their briefs and arguments, as they did most of their testimony, to a consideration of the sufficiency of the sewer to drain the territory connected with it, and to the question whether or not the city can be held liable if it failed to provide in the first place, a sewer of sufficient size, and capacity, and construction, to drain the area connected with it, and to enlarge such capacity from time to time so as to meet the increased burdens cast upon it by the building up of the city.

Counsel for the plaintiff showed by the reports of the sewer commissioner, and of the committee on sewers of the Board of Public Improvements, that this sewer needed enlarging, and that it had been many times overflowed, and they also showed that for more than two years before the date of this accident the city had been engaged in the construction of the Tower Grove storm sewer for the purpose of relieving the overburden on the Mill Creek sewer, but counsel contends that even that will not prove efficient, as only twenty-five per cent of the burden will be thereby removed, and counsel contends it is now overtaxed fifty per cent of its capacity. On the other hand, counsel for defendant show that in the seventeen years preceding the the accident, the city had expended upon the reconstruction and repair of this sewer $227,328.77. And they further show that the sewer is ordinarily competent to take care of all the demands upon it, and that it is only on occasions of violent and unusual storms like that that occurred on the occasion of the cyclone in 1896, and like the storm that occurred on the occasion here involved, July 8, 1898, that there has been an overflow.

The defendant further contends that the question of when and of what size or capacity a sewer shall be constructed is a governmental question that is confided to the Municipal Assembly, and that it is not competent or proper to permit a jury or a number of juries to sit in judgment over the city authorities, and say in the light of subsequent developments and the increased demands of a growing city, that the city authorities were negligent in not providing a sewer of sufficient capacity to meet all the then known and subsequently discovered demands upon it.   In support of this position counsel for defendant have cited a great number of cases and claim that such is the weight of modern authority.   And such is the rule laid down in Smith's Modern Law of Municipal Corporations, sec. 1169, and in 10 Am. and Eng. Ency. of Law, (2 Ed.), p. 241.

On the other hand, counsel for plaintiff contends that the city is liable if it fails to exercise ordinary care in the adoption of plans for a sewer, or in the construction of a sewer, which turns out to be insufficient to drain the territory connected with it, and cites cases in support of this contention.

Dillon on Municipal Corporations (4 Ed.), p. 1046, says the late cases properly tend to hold that the city is liable on the ground of negligence where the sewer is not of sufficient size, *"under ordinary conditions,"* to drain the district connected with it, and in consequence overflow and injure private property.

These are interesting questions concerning which courts are disagreed.   But it is not necessary or proper to consider or decide them in this case, because, in this case, there is no room for controversy that this sewer has always proved amply sufficient to meet the demands upon it *under ordinary conditions,* and that it is only in cases of unusual and extraordinary storms like that of May 27, 1896, when the cyclone visited St. Louis, and that of July 8, 1898, when there was a rainfall of 5.10

inches in twenty-four hours, and one or two other occasions, when there was an overflow.

If, therefore, it be conceded for the sake of the argument, that the discretion of the city can be reviewed by a jury and the city be made liable for a failure to construct a sewer of sufficient size to meet the demands upon it under ordinary conditions, and even if it be likewise conceded that the city acts ministerially and not in its governmental capacity when it constructs its sewers, still the plaintiff would not be entitled to recover in this case, because this injury did not arise from any breach of its duty or from any municipal negligence under ordinary conditions, but it arose from the act of God, from an unusual and unprecedented storm which was the greatest of which there is any record known to the signal service.

This sewer was scientifically built, according to the best judgment of the engineers of the days when it was built, and with the maximum capacity then deemed necessary or proper, of one inch an hour, which the United States signal service says is excessively heavy. It has proved efficient and sufficient under ordinary conditions. On a few occasions when there were unusual, unanticipated and extraordinary floods, it has not been sufficient to carry off storm waters as fast as they fell, and the lowlands, where the plaintiff's property is located, have been flooded. But while this is true, it is uncontradicted in this case that these same low lands were overflowed on like occasions before this sewer was built and when the drainage afforded by nature was insufficient to carry off the extraordinary rainfalls. So that this is not a case where the sewer constructed by the city affords less efficient drainage than was afforded naturally, nor is it a case like Rychlicki v. St. Louis, 98 Mo. 497, where the city collected surface water into drains and projected it in bulk and not naturally upon a man's lands.

This case falls within the rule laid down in Flori v. St. Louis, 69 Mo. 341, where the city was held not liable for damages produced by the fall of a market-house

caused by a windstorm of unprecedented force and virulence. In that case this court, per NORTON, J., said: "There was no obligation on the city in the construction and maintenance of the market-house to anticipate unprecedented windstorms, as required by the instruction. It would be strange doctrine to require defendant to anticipate such a storm as had never before occurred, and provide against it in the erection and maintenance of a market-house. The utmost requirement that could be exacted would be that they should keep the building in such condition as would enable it to withstand the ordinary force and power of ordinary and usual windstorms."

To hold a municipality for damages in a case like this would be to make it prohibitory upon the city to construct sewers at all. For if the city could be held liable under circumstances like those present in this case, it would practically be to say that the city is an insurer against all damages that may arise in any manner whatever, the act of God included. If this was the law no city could afford to build or maintain a sewer at all. Drains would have to be left in their natural condition. And in this case the damage to the plaintiff would have been the same, according to the undisputed testimony in the case, if Mill Creek had never been converted into a sewer.

In Brash v. St. Louis, 161 Mo. l. c. 438, this court, speaking through BRACE, J., quoted with approval the rule laid down in 1 Shearman & Redf. on Neg. (5 Ed.), sec. 39, wherein it is said that if the negligence of the city concurs with a superior force, as the act of God, the city is liable, "but if the superior force would have produced the same damage whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury." And the learned judge added: "And this is the prevailing doctrine in this State," and cited many cases in support thereof; concluding with the remark, "There is nothing in the rul-

ings in Flori v. St. Louis, 69 Mo. 341, or Turner v. Haar, 114 Mo. 335, inconsistent with this doctrine.''

The plaintiff, however, invokes section 21 of article 2 of the Constitution, which provides ''that private property shall not be taken or damaged for public use without just compensation,'' etc.

This provision has no application to this case. If the defendant could be held liable at all, it would be on the ground of negligence and not as for a taking or damaging of private property for public use. [Van De Vere v. Kansas City, 107 Mo. 83; Rude v. St. Louis, 93 Mo. 416.]

These considerations produce the conclusion that the plaintiff failed to make out a case against the city, and that the demurrers to the evidence should have been sustained. The judgment is reversed. All concur.