MODEANA· RIGGS and MODEANA RIGGS, Administratrix of R. L. RIGGS, v. CITY OF SPRINGFIELD, a Municipal Corporation, Appellant.—126 S. W. (2d) 1144.

Court en Banc, April 4, 1939.

W. D. Tatlow, Kirby W. Patterson, John S. Farrington and Sam M. Wear for appellant; Don O. Vernon of counsel.

*John T. Sturgis, Phil M. Donnelly, Harold T. Lincoln, A. C. Hayward* and *Frank B. Williams* for respondents.

424

DOUGLAS, J.—Plaintiffs, husband and wife, are riparian owners of land on Wilson Creek near the City of Springfield. They have sued for the damage to their land caused by the city in gathering together and emptying sewage into the creek, thereby polluting the water and creating smells. The petition was filed in the Circuit Court of Greene County on the 6th of March, 1934. On change of venue, the case was tried in the Circuit Court of Laclede County, and resulted in a judgment of $1500 for the plaintiffs. The Springfield Court of Appeals affirmed the judgment. One of the members of the court dissented on the ground that the majority opinion was in conflict with Smith v. City of Sedalia, 244 Mo. 107, 149 S. W. 597, decided by this court and with Luckey v. City of Brookfield, 167 Mo. App. 161, 151 S. W. 201, and Carpenter v. City of Versailles (Mo. App.), 65 S. W. (2d) 957, both decided by the Kansas City Court of Appeals, and certified the case to this court. It is here as if it had been appealed directly. [Constitution of Missouri as amended in 1884, Art. VI, Sec. 6.] Division No. One first heard this case and an opinion was submitted but it was not adopted. The case was then transferred to the court en banc where it was

reargued and assigned to the writer for an opinion. The long journey which this case has taken and the number of hearings it has been given have presented to counsel for both sides an opportunity of furnishing the court with more than the usual number of briefs. Counsel have availed themselves of this opportunity vigorously and skillfully and the court is benefited by the thorough and searching discussion and advocacy of the matters in controversy.

It was undisputed that, and the trial court found the facts to be, in 1893 the City of Springfield established a general sewer system for that part of the city south of Commercial Street, connected this system with Wilson Creek, and until 1913 emptied its raw, untreated sewage into such creek at or near the same place where it now empties it; in 1913 the city erected and put into operation its first sewage disposal plant, an Imhoff tank which discharged its effluent into Wilson Creek; in 1928 the city installed a second plant known as a "Separate Sludge Digestion plant" and which will be referred to as the "new plant," which also discharges its effluent into Wilson Creek and was operated in conjunction with the Imhoff tank up to the time of the filing of this suit. The facts further show that the plaintiffs were, and had been for twelve years at the time the petition was filed, or since 1922, the owners of thirty-one acres of land located about one mile southwest of Springfield through which Wilson Creek (sometimes called Jordan Creek) meanders. The plaintiffs had a stock and dairy farm and also their dwelling house on this land.

Referring to the pleadings we find that the plaintiffs alleged that the city had established an extensive sewer system emptying into Wilson Creek which carried off the sewage from the greater part of the city; that later it had built the first sewage disposal plant which purified and deodorized the sewage before it was emptied into the creek, so that the waters of the creek were for a time reasonably pure and inoffensive. Thereafter, as the city grew in population and area, its sewer system was necessarily enlarged and extended and the volume of sewage was so largely increased as to cause a recurrence of the extensive pollution and odors which had theretofore been corrected by the disposal plant. Then the city built its second plant or the "new plant" which was put into operation in 1928. This plant also proved efficient and left the waters of Wilson Creek reasonably pure, but the city continued to grow and the volume of sewage to increase, again causing a recurrence of the condition complained of. Plaintiffs asked for damages for the impairment of the use and enjoyment of their land or, as otherwise stated, for the temporary injury during the five years before the suit was filed.

The defendant answered that it was a city of the third class and was empowered to construct a sanitary system under the laws relating to such cities; that in 1893 by ordinance, it provided for a

general sewer system pursuant to which it constructed and put into operation a system which had its terminus or outfall at Wilson Creek, whereby the raw sewage from the city was discharged into the creek at practically the same point where it is now discharged; that since said year it has continuously openly and adversely to the riparian owners, emptied its sewage into the creek; that the sewer system was permanent in character when it was connected with the creek, which was the only natural watercourse into which the city could empty its sewage; that at that time the right to claim damage accrued; that the operation of the sewer system since 1893 to date has continuously polluted the water of the creek and has caused smells and odors; that for more than ten years before plaintiffs acquired their property the city, under authority conferred by statute, had acquired the right to use the creek so that this claim for damages had accrued to the former owners of the land and not to plaintiffs; and that all claims are now barred by the Statute of Limitations.

We find substantial evidence tending to show the use of the creek by the city commencing in 1893 and continuing to date which polluted the water and caused odors adversely to the rights of the riparian owners.

One of plaintiff's witnesses—J. F. Wilson, expressly referred to the injury to the market value of the property in 1922-23. The following appears from his cross-examination:

"I came there on this farm the first day of 1900; it wasn't bad, near so bad; it came bad by degrees over a few years. I don't remember just when, on up till the present time. It was around 1912 that the sewage disposal plant was built.

"Q. Well, I am talking about 1913 and 1914. Was it any better then than it was before they put in that plant? A. Very little. It helped but very little and for a short time. . . .

"Q. What was the condition around 1920, '21, '22, around in there? A. Well, the condition was bad enough, but getting worse all the while. In 1922 and 1923 it was bad enough that it interferred with us a great deal, from that time on up why it began to cut a great figure in the value of the property."

There were a number of plaintiff's witnesses who testified that the then condition of the creek as to the deposit of sewage, pollution of the water and odors, had existed over a period of from fifteen to thirty years with fluctuating intervals of betterment. One of the plaintiff's witnesses testified to the fact that there was raw sewage in the creek in 1893.

W. E. Freeman, former Mayor of Springfield, testified for the defendant that all swimming ceased in the creek in 1893 because of the raw sewage in it, and that the condition of the creek became increasingly worse until it was alleviated by the building of the 1912 plant, then again grew worse, but was again alleviated by the building of the new plant in 1928.

At the close of plaintiff's case and also at the close of the entire case, defendant offered demurrers to the evidence which were refused. Before the case was submitted to the jury defendant offered instructions on both the five and ten-year Statutes of Limitations, and on the theory that defendant had acquired the permanent right to utilize Wilson Creek for the emptying of its sewage by the construction and completion of the sewer system in 1893, so that any right to damages accrued to the then riparian owners, and also offered other instructions all of which were refused.

The trial court arrived at its own conclusion as to the theory of the case, and of its own motion instructed the jury. It recounted to the jury the use of the creek since 1893, the erection of the disposal plants, the fact that for one year after the new plant was put into operation it was efficient in purifying and deodorizing the sewage so that the waters of the creek were reasonably pure and inoffensive. Then it instructed the jury that if the plants were operated so that the offensiveness of the waters of the creek was unnecessarily and carelessly increased that the city was liable. In other words—the standard was "the reasonably pure and inoffensive" condition of the water as it was immediately after the new plant was put in operation.

Plaintiffs claimed that their damages accrued after the erection of the new plant so that the Statute of Limitations was not applicable to them. The Springfield Courts of Appeals so held. In its opinion, Riggs v. City of Springfield (Mo. App.), 96 S. W. (2d) 392, it stated its conclusion: "that the nuisance was considered as an abatable one and we do so consider it in preparing this opinion." Having reached that conclusion it held that the cause of action was not barred by the Statute of Limitations. If that premise is correct, the conclusion is right, but we entertain a different view concerning the theory upon which the case was tried.

In the course of their extended briefing of this case in this court both parties proceed upon the same general theory, namely—that while the use of the creek complained of is one in the nature of a nuisance, the law applicable to this case is the law of eminent domain and is subject to the condition that private property may be taken or damaged only upon the payment to the owner of just compensation.

Respondents, in stating their position, lay down these propositions of law as governing this case to which appellant agrees:

1. Under Section 21 of Article II of the Constitution of Missouri, private property shall not be taken or damaged for public use without just compensation. The law of eminent domain as governed by this condition controls this case.

2. The State, by express statutory enactment from time to time, delegated to municipal corporations its sovereign power of eminent

domain to enable them to deal with the disposal of sewage. [Thurston v. City of St. Joseph, 51 Mo. 510.]

3. The right to compensation for causing an injury to a riparian owner by the city in disposing of its sewage by discharging such sewage into a watercourse flowing onto or over the riparian owner's land to his injury, is given and guaranteed by this constitutional provision. [Joplin Consolidated Mining Co. v. Joplin, 124 Mo. 129, 27 S. W. 406; Smith v. Sedalia, 152 Mo. 283, 52 S. W. 907; Smith v. Sedalia, 244 Mo. 107, 149 S. W. 597; Cape Girardeau v. Hunze, 314 Mo. 438, 284 S. W. 471.]

4. The right to compensation guaranteed to the riparian owner whose land is damaged in this manner is not based on any wrong or negligence, or trespass, but on the mere fact that the landowner is damaged by having his land so used, and is recoverable by an ordinary action at law for damages. [Werth v. Springfield, 78 Mo. 107; Pundman v. St. Charles County, 110 Mo. 594, 19 S. W. 733; Webster v. K. C. & S. Ry. Co., 116 Mo. 114, 22 S. W. 474; Gulath v. City of St. Louis, 179 Mo. 38, 77 S. W. 744.]

5. The law of nuisance is not involved in this case.

However, the authorities on this question are in conflict as to what theory of law should be applied to cases of this nature. In Markwardt v. Guthrie, 18 Okla. 32, 90 Pac. 26, 9 L. R. A. (N. S.) 1150, the court announced this conclusion: "(1) That the settled doctrine of the English Courts, as well as some of our State courts, is that a lower riparian proprietor is entitled to recover damages for the pollution of the waters of a stream by a municipal corporation, by the discharge of sewage into the stream, on the broad ground of common sense and natural justice; (2) that the Supreme Court of the United States and a number of the State courts base their decision on the ground that it is a taking of private property for public use, within the meaning of the Federal Constitution; (3) *that other States hold that it is a damage to property, within the meaning of their constitutional inhibitions against the taking or damaging of property without just compensation;* and (4) a number of the States hold that the lower riparian proprietor is entitled to recover damages for injury to his health, comfort, and repose, on the ground that it is the maintenance of a nuisance." (Our italics.)

In McLaughlin v. City of Hope, 107 Ark. 442, l. c. 449, 155 S. W. 910, 47 L. R. A. (N. S.) 137, the court said: "Since the city's action in construction its sewer system so as to turn the sewage into (Hannegan's) branch indicates an intention to acquire a permanent right to continue to so use it and pollute the stream, the damages to the owner should be assessed upon that basis, *and as though the city were proceeding to acquire it under its power of eminent domain.* [1 Farnum, Water Rights, sec. 139-A.]" (Our italics.)

Under Sections 1524 and 1541-4, Revised Statutes 1889, the City

of Springfield had the right to condemn private property for use for sewer purposes in the same manner as other property might be condemned for public purposes. These statutes also provided that in setting up its system of sewers, public sewers should be established along the principal courses of drainage and that district sewers might be connected with such natural courses of drainage. We said in Joplin Consolidated Mining Co. v. City of Joplin, 124 Mo. 129, 27 S. W. 406, that it was the clear implication of the language of these statutes that the principal courses of drainage may be used for sewer purposes. In that case we held that the City of Joplin had the right and power to construct the public sewer in question so that it would discharge its contents into Joplin Creek. In City of Cape Girardeau v. Hunze, 314 Mo. 438, 284 S. W. 471, we held that the city had the right to acquire by condemnation the use of a natural watercourse for sewer purposes although such use caused more pollution and increased damage to a riparian owner's land than the natural wash and drainage.

The similarity of the facts makes the reasoning contained in the opinion in the case of Smith v. Sedalia, 244 Mo. 107, 149 S. W. 597, peculiarly apposite here. While the opinion in that case received the concurrence of only three judges, a fourth judge concurring in the result only, we believe the reasoning to be sound, and expressly approve and adopt it in its entirety. There it was conceded that the City of Sedalia had the right to condemn the watercourse for sewer purposes. In discussing the nature of a claim for damages against the city for the pollution of the water, we said: ''This suit is not grounded upon trespass merely, nor upon nuisance, although the injury takes the form of a nuisance, but upon the constitutional right to compensation for property damage for public use (Webster v. Railroad, 116 Mo. l. c. 118; Turner v. Railroad, 130 Mo. App. 540); and it is so argued in plaintiff's brief. The city, by proper proceedings to that end, had the right by statute to secure the use of this stream for sewer purposes. The city did not condemn, but appropriated the use. Such action, however, does not deprive the plaintiff of his right to compensation, nor does it affect the measure of damages, which, for such use by the city, whether by condemnation or appropriation, is the diminution in market value of the land damaged. As this court said in McReynolds v. Railroad, 110 Mo. l. c. 488, 'no good reason, founded upon principle, can be assigned why the same rule should not be applied in both classes of cases' (condemnation and appropriation); 'the injury is the same, the damage is the same, and the compensation should be the same.' ''

We hold, therefore, that under the pleadings and proof this case is controlled and must be determined by the law of eminent domain. No part of plaintiffs' land was taken within the meaning of the Constitution, only an easement to use the watercourse was ap-

propriated, so that it was not necessary first to institute condemnation proceedings. The city appropriated the right to use the creek. Those whose lands were damaged because of such use by the pollution of the water and by the noisome smells had their rights of action to recover compensation within the statutory period of limitation. When did this period commence to run? Did it commence at the time the waters of the creek again became contaminated, about one year after the completion of the new plant? So respondents claim. Or, did it commence when the sewer was connected with the creek as a permanent improvement and the city started emptying, to the injury of the riparian owners, raw sewage into the creek? This is appellant's contention.

█ Respondents insist that while the city may have appropriated the right to use the creek, the city's title to the easement could become perfect and complete only by prescription. Such would require a use for ten years which was uniform, continuous, uninterrupted and with equally injurious results throughout the entire prescriptive period. If, during this period, the city enlarged its use it could not claim at the end of the original period the use ·as so enlarged, but a new period must run from the time the use was enlarged. They cite the rule that the use must not only be continuous in point of time, but substantially identical during the whole statutory period with respect to manner and extent. They claim that the character of the city's use of Wilson Creek, as shown by the evidence, was neither uniform, continuous nor uninterrupted, but should be classified into three different periods, to-wit: First period from 1893 for twenty years until 1913, when the Imhoff tank was put into operation, during which raw sewage was emptied into the creek in constantly increasing amounts; second period from 1913 for sixteen years through 1928, when the new plant was built, during which time the Imhoff tank was operated in an attempt to purify·the sewage output which at first it did but then the condition of the creek became progressively worse, and; third period from 1928 to 1934, when the suit was filed, during which time both plants were operated and the damage sued for was caused. Respondents claim their damage was inflicted during this last period and by their petition so limited their right of recovery.

To obtain rights through prescription, it was necessary to observe strict requirements probably because, originally, title to an easement could not be acquired by adverse possession. In England easements, as incorporeal hereditaments, were said to lie wholly in grant, and Statutes of Limitation were held to apply only to actions for the recovery of land. In time the fiction of a "lost grant" was adopted by the courts—that is, the courts presumed from the long possession and exercise of right by the claimant with the acquiescence of the owner, that there must have been originally a grant by the owner to

the claimant which had become lost. Then it was called a "lost grant" not so much to indicate the existence of the grant originally, but to avoid the rule of pleading requiring profert. [17 Amer. Juris. Easements, sec. 55; Boyce v. Mo. Pac. Ry. Co., 168 Mo. 583, 68 S. W. 920.] Necessarily, therefore, when a way is claimed by prescription, the character and extent of it is fixed and determined by the use under which it is gained. Any material change in its use during the course of the prescriptive period interrupts and may prevent the acquisition of the right. [Washburn on Easements and Servitudes, p. 136, et seq.] Under prescription an exclusive right of possession cannot be established but only a qualified right for a particular purpose. [Jones on Easements, sec. 161.]

These restrictions do not adhere to rights in property taken under the laws of eminent domain or to rights acquired by "appropriation." The extent of the power of condemnation of private property for public use is left to the discretion of the Legislature. [Moberly v. Lotter, 266 Mo. 457, 181 S. W. 991.] The right so to take property is in the exercise of sovereign power and its exercise or extent is not governed as in prescription by acquiescence of those whose property is taken in the limited and particular use exercised. It is the general rule that the owner of land subject to a public easement has no right to insist that the public use remain precisely the same, and if the original use is changed to another of the same general character and no new or other burdens are imposed, there is no reversion and the owner is not entitled to additional compensation. [18 Amer. Juris. Eminent Domain, sec. 127.]

The city denies that the theory of prescription in any way applies to the right it has acquired. Under its power of eminent domain it asserts it could have condemned the easement in Wilson Creek for sewage purposes; that it appropriated this right when it permanently connected its sewer system with Wilson Creek and discharged raw sewage into the creek; that increase in sewage is incidental to all city sewer systems; and that its title to such easement has become perfected by the running of the Statute of Limitations. The city claims the right under the easement to pollute the stream for all time and to any extent necessarily incidental to the discharge of its sewage therein. It follows, the city claims, that such rights as the plaintiffs now assert for compensation because of the damage to their property are and have long since been barred by the Statute of Limitations, as the right to sue lodged in the then riparian owners of the same property when the use of the creek was appropriated.

The city relies on Smith v. Sedalia, 244 Mo. 107, 149 S. W. 597, supra. It should be noted that while the decision of that case turned on a procedural point, the pendency of another suit, it was necessary to determine whether or not the injury was permanent at the time when the city first appropriated the use of the watercourse.

That was an action for the wrongful pollution of a natural watercourse which ran through the plaintiff's farm. In 1893 the City of Sedalia brought the terminus and outfall of its public sewer system to a point on the watercourse only 600 feet from the farm. In 1895 plaintiff sued the city claiming damages resulting from the depreciation of the value of the farm and its rental value. The defendant recovered a verdict but plaintiff's motion for new trial was sustained, and the defendant appealed to this court, where the judgment granting a new trial was affirmed. [Smith v. Sedalia, 152 Mo. 283, 53 S. W. 907.] On retrial defendant again prevailed but, as before, the court sustained plaintiff's motion for new trial which action this court affirmed. [Smith v. Sedalia, 182 Mo. 1, 81 S. W. 165.] Since then that action, brought in 1895, lay dormant. Then in 1902 the same plaintiff instituted a new action seeking to recover damages inflicted during the preceding five years for the rental value of the farm. He recovered judgment but on appeal to the Kansas City Court of Appeals it was held that the second action was barred by reason of the pendency of the first, and directed a judgment for defendant. It is important to note that the first action (instituted in 1895) was at the time still pending and that in it the plaintiff sought to recover damages for the depreciation in the value of the farm, i. e., permanent damages. The Kansas City Court of Appeals transferred the case to this court for determination. We said, at page 119: "The first and important question is whether the former suit is a bar to this one. The answer to this depends upon whether the injury complained of in that case was permanent in character. If it was, then as this is for the continuation of the same injury, the two cases present the same cause of action, and the pendency of the first suit is a bar to this, under Sections 1800 and 1804, Revised Statutes 1909, which provides that another suit pending in this State for the same cause may be pleaded in bar of a second suit.

". . . It is true that since the completion of this main sewer, in 1893, additional district sewers have been incorporated into the general system, and doubtless others may be added hereafter. It is also true that as the population grows the main sewer will discharge an increased volume of contents into the creek. This increase in use, however, is incidental to all sewers, but does not affect the question of the permanent character of the injury. If condemnation proceedings had been instituted in 1895 to acquire the use of this stream, the damages would have been fixed for all time, notwithstanding the impossibility of ascertaining at that time the extent of future use that might be made of the sewer. For this reason the damages would necessarily be to some extent conjectural; but that fact would not deprive the city of the right to condemn, nor prevent the ascertainment of final damages. In 1893, therefore, the sewer was, so far as human wisdom could forecast, a permanent institution, subject only

to an increase of use. Had the city then condemned, as plaintiff now claims was its duty, the watercourse would have been lawfully appropriated for such use as the wants of the city might require, but the damages would have been fixed then, as best could be done, for all time. When, therefore, plaintiff sued the city in 1895, his cause of action was complete for a permanent injury. . . .

"It is urged that this sewer system is not permanent, because it is within the power of the city to discontinue its use. The plaintiff ought not to complain of this possibility, if his damages are fixed on the basis of permanent injury. The same possibility exists in every taking of property for public use. A railroad right of way or a street may be abandoned. We can only judge of the future by probabilities based on experience. So far as can be judged now, or could have been judged in 1895, this sewer is permanent. . . . We cite, with approval, the following from the opinion of JOHNSON, J., of the Kansas City Court of Appeals, in this case:

" 'These authorities compel us to say that the nuisance in question is permanent, and that plaintiff, if injured thereby, had a cause of action for his damages past and future, all of which were comprehended in and were to be measured by the depreciation in the market value of his land caused by the presence of the sewer. For eighteen years past the sewer had remained in its present condition. It is just as substantial and enduring as a railroad embankment, drainage ditch, highway bridge, street pavement, office building or city hall. It was built without any intention or expectation that it would be removed or materially changed for years to come, and if the present action was one for permanent damages and was the only suit pending between the parties, we would not hesitate in declaring that plaintiff had made out a case for the jury, and that the true rule for measuring his damages was the depreciation in the market value of the land.' . . .

"Plaintiff appeals to the constitutional provision against taking private property for public use without compensation, and particularly to this clause: 'And until the same (compensation) shall be paid to the owner, or into court for the owner, the property shall not be disturbed or the proprietary rights of the owner therein divested.' But the city has not disturbed the property of plaintiff, nor divested him of any proprietary rights. It has not invaded his land, but has erected a structure no nearer thereto than six hundred feet. The damages to plaintiff are consequential. As to such damages, the Constitution does not require that they be paid in advance of the work. The city had a right, under the statute, to utilize this watercourse for sewer purposes. [Secs. 1524, 1544, R. S. 1889; Secs. 9281, 9298, R. S. 1909; Mining Co. v. Joplin, 124 Mo. 137.] Its failure to first condemn in no way impairs plaintiff's right to compensation. In fact, it would be difficult to measure such consequential damages before the structure from which they arise is erected and the in-

jurious effects become manifest. The constitutional provision above referred to received full discussion in Clemens v. Ins. Co., 184 Mo. 46. In that case, after reviewing the authorities, GANTT, J., concludes: 'Where the property of the citizen is not taken, and his proprietary rights not disturbed, but the damage to his property is purely consequential, he is not entitled to have the same ascertained and paid before the proposed public work is done, and is not entitled to have the work done in pursuance of valid Legislature and municipal authority enjoined until his damages are ascertained and paid, but that his remedy is one at law for damages.' Under this authoritative construction of the Constitution, but one question arises in this connection, namely, is the damage here consequential? We rule that it is." [Smith v. Sedalia, 244 Mo. 107; 149 S. W. 597.]

(The rule as to the payment of consequential damages quoted from Clemens v. Insurance Co., 184 Mo. 46, 82 S. W. 1, supra, is approved in McGrew v. Granite Paving Co., 247 Mo. 549, 155 S. W. 411, and Lemon v. Garden of Eden D. Dist., 310 Mo. 171, 275 S. W. 45.)

■ So, in the instant case, the very words of that case can be applied here. We repeat for emphasis: "In 1893, therefore, the sewer was, so far as human wisdom could forecast, a permanent institution, subject only to an increase of use. Had the city then condemned, as plaintiff now claims was its duty, the watercourse would have been lawfully appropriated for such use as the wants of the city might require, but the damage would have been fixed then, as best could be done, for all time." [See, also, Luckey v. Brookfield, 167 Mo. App. 161, 151 S. W. 201.]

Again, we said in another case in discussing the remedies of the landowner upon the appropriation of his land that: ". . . we must look to the real cause of action, which is, I think, one arising because of (and on) the unlawful and absolute appropriation of the land. *That cause of action accrued if at all, at the time the land was subjected to said permanent and wrongful appropriation.* . . . The most favorable view to plaintiffs is that . . . by the flux of time, it has long since been lost to them by delay in suing. We say 'most favorable view,' because if the thing be considered a mere right of damages, a chose in action, then the right of recovery was lost sooner and on obvious grounds." [Rivard v. Mo. Pac. Ry. Co., 257 Mo. 135, l. c. 172, 165 S. W. 763.] (Our italics.)

A similar rule is applicable to permanent nuisances. "The cause of action accrues in such cases against the party erecting the permanent nuisance, and in favor of the owner of the land at the time of such erection or the first resulting injury." [Hayes v. St. Louis & S. F. Ry. Co., 177 Mo. App. 201, 166 S. W. 266; Howard County v. Chicago & Alton Railroad Co., 130 Mo. 652, 32 S. W. 651. See, also, the following cases and the citations set out in them: Person v. City of Independence (Mo. App.), 114 S. W. (2d) 175; Kent v. City of

Trenton (Mo. App.), 48 S. W. (2d) 571; Gorman v. Chicago, B. & Q. Ry. Co., 166 Mo. App. 320, 148 S. W. 1009; DeGoefroy v. Merchants Bridge Term. Ry. Co., 179 Mo. 698, 79 S. W. 396.]

The ruling in Oklahoma City v. West, 155 Okla. 63, 7 Pac. (2d) 888, cited by respondents, that the turning of unpurified sewage into the river at Oklahoma City was not a permanent but was a temporary nuisance and therefore abatable, does not aid respondents. The petition in that case contained an admission that a prior action had been settled by a stipulation containing the promise of the city to abate the nuisance by purification of the sewage, which promise the city failed to keep. In addition, the court took judicial notice "of the fact that modern science had advanced to the point where sewage is capable of purification, . . . and successfully purified by the use of modern appliances," and followed the doctrine well established by the courts of that State that a nuisance is only a temporary nuisance when it may be abated by the expenditure of money or labor.

Respondents also cite the case of City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U. S. 334, 79 Law Ed. 1208, in support of their contention that the injury was not a permanent one. That was a suit filed in the Federal Court for damages for injury to the plaintiff manufacturing company's property, a stock farm, because of the drainage of the effluent from the city's disposal plant into Town Creek which flows through plaintiff's farm. An injunction was also sought.

In holding that the pollution of the creek could not be deemed a permanent nuisance as of the date of the installation of the disposal plant in 1923, the court expressly said that it had no occasion to determine the scope of the doctrine of permanent nuisance as applied in Missouri. The nuisance was held to be a temporary or abatable one, because the court found as a fact that when the sewer was constructed in 1923 with an Imhoff tank an additional plant for further treatment of the sewage which could practically have obviated the trouble could have been installed at the same time.

No evidence was introduced that when the sewer involved in the instant case was put into operation that septic tanks, Imhoff tanks or other devices for sewage disposal were known or in common usage. A study of the development of sewage disposal discloses that among the first plants using a modern system of septic treatment was built in the United States in 1894 at Urbana, Illinois. The first installation of an Imhoff tank in the United States was at Philadelphia in 1911. The appellant's installation of an Imhoff tank followed shortly after this. At all events back in 1893, the city appropriated an easement for the drainage of untreated sewage and exercised this right for a period of twenty years. The testimony shows that raw sewage was seen in the creek from the beginning and that during at least a part of that period the condition of the creek as to the presence of sew-

age, pollution and smells was bad. The increase in sewage was caused by the natural and to be expected increase in the population of the city, by the normal extension of the system of sewers as originally planned, and not by any change of the basic plan whereby other sewer systems were added.

Then, the Imhoff tank was installed by the voluntary action of the city, as far as we know, to alleviate the condition existing in 1912. By doing this, can it be argued that the city abandoned its easement theretofore appropriated, permitting the emptying of raw, untreated sewage into the creek and in lieu of that right commenced the establishment of a prescriptive right to pollute the stream in such a manner as would be expected to result from the discharge of treated sewage from the plant installed? It would be a harsh rule which would cause the loss of a right acquired by condemnation or appropriation through the voluntary effort of one possessing the right to exercise it in a degree less injurious to others. We hold that the city's right to empty raw, untreated sewage into the watercourse was not lost by the erection of the Imhoff plant or the new plant.

The respondents' claim is barred by the Statute of Limitations and the trial court erred in not sustaining appellant's demurrer to the evidence. The action accrued when the sewer was completed and put in use. Under the authority of Clemens v. Insurance Co., 184 Mo. 46, 82 S. W. 1, supra, the damages were consequential so that the five-year statute applies. [DeGeofroy v. Railroad Co., 179 Mo. 698, 79 S. W. 386; Kent v. City of Trenton (Mo. App.), 48 S. W. (2d) 571, and cases therein cited.]

Under no circumstances however would the city be privileged to create or maintain a public nuisance in the exercise of its use of the easement. The grant of power to a municipality to condemn for sewer purposes presumes a lawful exercise of the power conferred, and the authority to create a public nuisance will not be inferred. [See Joyce on Nuisances, sec. 284.] The right of the city to empty its sewage into a stream or a river is merely a legislative license, revokable whenever the public health and safety require. [Van Cleve v. Passaic Valley Sewerage Commissioners, 71 N. J. L. 183, 58 Atl. 571.] Furthermore, the State Board of Health, under Section 9105, Revised Statutes 1929 (Mo. Stat. Ann., sec. 9105, p. 4178), has imposed upon it the duty "to safeguard the health of the people in the State, counties, cities, villages and towns." We recognize the fact that pollution abatement is a subject of national importance. President Roosevelt in a message to the Congress of the United States on February 15, 1939, devoted exclusively to this subject said that while no quick and easy solution to the problem is in sight that many State agencies have forced remedial action where basic studies have shown it to be practical.

As we have stated above, appellant offered a general demurrer

438

at the close of respondents' evidence and again at the close of all the evidence. These were overruled, whereupon appellant offered and the court gave an instruction telling the jury that plaintiffs' recovery, if any, was limited to injury caused by the negligent or improper operation of the disposal plants. In view of the fact that the trial court, on its own motion, restricted the issues to that issue alone, appellant did not waive other defenses by offering an instruction presenting as favorably as possible an issue it was forced to meet. [Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600.]

For the reasons stated, the judgment should be reversed. It is so ordered. All concur.