Terry ANNIN and Wilma Annin, et al.,
Plaintiffs–Appellants,

v.

LAKE MONTOWESE DEVELOPMENT
COMPANY, INC.,
Defendant–Respondent.

No. 53209.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 2, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 12, 1988.

Application to Transfer Denied
Nov. 15, 1988.

Dana Hockensmith, Evan J. Beatty, St. Louis, for plaintiffs-appellants.

Benson Cytron, House Springs, for defendant-respondent.

GRIMM, Judge.

Appellants are lot owners in a lake front subdivision developed by respondent company. The company owns the lake and accompanying dam. Seeking damages, the owners claim that the company has an obligation to repair the dam to meet current state requirements. The trial court, in a non-jury hearing, found no obligation and dismissed the claims.

The lot owners raise a single allegation of error: That the trial court "erroneously declared and applied the law" in failing to impose an obligation on the development company to reconstruct the failing dam. We disagree and affirm.

On April 12, 1941, the company was incorporated; and on May 20, 1941, filed restrictions. They provided that the company annually could levy an assessment on the lot owners "for the upkeep and maintenance of the dam, roads and other improvements, provided, however, that no assessment for any one year shall exceed the sum of forty-five cents (45¢) per front foot." The restrictions, also, provide that the lot

owners, their heirs and assigns, have "license personally ... to the use and privileges of the lake." The restrictions were for a 25 year term; however, pursuant to the restrictions and an agreement of the lot owners, they were extended an additional 25 years.

By 1942, the dam had been constructed, the lake was "three-fourths full," and the first lots were sold. In 1946, the subdivision had six houses; in 1987, approximately 100 houses. The company still owns about 25 lots and some unplatted land.

The dam has needed repairs on at least four occasions, 1943, 1948, 1983, and 1984. The 1943 repairs, involving widening the spillway and costing approximately $1200, were financed by the company. A major reconstruction of the dam in 1948 was financed by the lot owners through donations. The lot owners later received stock in the company based on the amount they donated. The 1983 repairs were financed by the lot owners through donations; stock was not given. In 1984, when the lake was full, the dam did not comply with the Missouri Dam and Reservoir Safety Act, §§ 236.400—.500, RSMo. 1986. As a result, the company was required to lower the level of the lake. In order to raise the water to its normal level, repairs costing approximately $150,000 are needed.

The basic question is whether the company has an obligation to repair the dam. The answer is controlled by the relationship that exists between the parties.

■■■ The deed of restrictions speaks of granting the lot owners a "license personally ... to the use and privileges of the lake." A license, or as it is sometimes referred to, a "bare license," grants the licensee the privilege to go onto the premises for a certain purpose and it does not vest in the licensee any title, interest, or estate. *Wilson v. Owen*, 261 S.W.2d 19, 25 (Mo.Div.1 1953). A license, also, may be revoked at the will of the licensor. *Kansas City Area Transp. Auth. v. Ashley*, 485 S.W.2d 641, 644 (Mo.App.W.D.1972). A licensee, therefore, has no right to impose an obligation on the licensor to repair the premises. Thus, if the relationship between the parties is based on a license, the trial court did not err in declaring that the company had no obligation to repair the dam.

Missouri recognizes that some "licenses" are in fact easements; and thus different rights and obligations are created. For example, in *Wilson v. Owen*, 261 S.W.2d 19 (Mo.Div.1 1953), the supreme court found that similarly situated lake front lot owners were granted an easement through the following language:

The purchasers of lands in this subdivision shall have the privileges of the use of the lakes constructed or built, or to be constructed or built, and owned by the proprietors of this subdivision, for swimming, boating and fishing purposes; but such privileges, however shall at all times be subject to the rules and regulations of said proprietors or to the heirs or assigns of said proprietors, or of any organization or committee to which the control of such lakes may be given.

*Id.* at 21. The court stated that the rights granted to the property owners "were privileges and easements which the lot owners had bought and paid for." *Id.* at 25. The court continued that the "privileges of the use of these lakes was far more than a mere naked license or permission to do an act or a series of acts upon the real estate (or lakes) of the proprietors which was revocable at the mere will or desire of the proprietors." *Id.* The court reasoned: "Even a license is irrevocable when coupled with an interest and supported by a valuable consideration, or when it is necessary to the possession or enjoyment of a right or privilege, which arose from the act or contract of the person who created or reserved the power." *Id.*

■■■ We do not, however, need to determine if the lot owners have an easement instead of a base license. For, even if they have an easement, the company had no obligation to repair the dam. The lot owners, as owners of the easement, have the dominant estate. The company, as owner of the lake, has the servient estate. The court in *Gnau v. Union Elec. Co.*, 672 S.W.2d 142, 145 (Mo.App.E.D.1984), stated,

"The owner of the servient estate is under no obligation to maintain or repair." *See* 2 G. Thompson, Thompson on Real Property § 429 (1980). Here, the company as owner of the servient estate has no obligation to repair the dam.

 The lot owners do not specify the type relationship that exists between the parties. Rather, they contend that the language in the Restrictions which granted the company the right to assess up to 45¢ per front foot per year for "upkeep and maintenance of the dams, roads and other improvements" created an obligation on the company to provide the lake and maintain it. In support of this position, the lot owners cite *Lake Wauwanoka, Inc. v. Spain*, 622 S.W.2d 309 (Mo.App.E.D.1981). Although *Lake Wauwanoka* involved a similar clause, that court was not asked to determine whether an obligation existed on the company's part to maintain the lake. Rather, the issue was whether a court could amend the restrictions to provide that they could be changed by a majority of the lot owners, instead of requiring the written consent of all lot owners. This court held that the language was clear and the court could not rewrite the agreement. *Id.* at 314. In so saying, the court was referring to the clear language requiring unanimous written consent. *Lake Wauwanoka* does not stand for the proposition that a development company has an obligation to maintain and repair dams, roads, and other improvements for the front foot assessment.

Finally, the conduct of the lot owners indicates that they recognized that only a limited amount of maintenance and repairs could be paid by the front foot assessments. As a result, in 1948, a major reconstruction of the dam was financed through donations from lot owners. Repairs in 1983 were paid for with donations. Annually, "pothole plugging parties" were held to generate funds to repair subdivision roads. Thus, the lot owners, through their course of conduct for approximately forty years, have recognized that the restrictions did not require the company to maintain the lake and roads from the proceeds of the assessments.

Finding no error, the judgment of the trial court is affirmed.

SIMON, P.J., and CRANDALL, J., concur.