**TAMKO ASPHALT PRODUCTS, INC., Plaintiff–Appellant,**

v.

**ARCH ASSOCIATES, a/k/a Arch Associates Limited Partnership, Herbert M. Katzenberg and Susan B. Katzenberg, Defendants–Respondents.**

No. 59780.

Missouri Court of Appeals, Eastern District, Division Three.

Feb. 4, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 19, 1992.

Application to Transfer Denied June 30, 1992.

**436**

Thompson & Mitchell, James W. Erwin, St. Louis, for plaintiff-appellant.

Bryan, Cave, McPheeters & McRoberts, Gerard T. Carmody, Elizabeth C. Carver, St. Louis, for defendants-respondents.

PUDLOWSKI, *Presiding Judge.*

This appeal is from a judgment of the Circuit Court of St. Louis County in which appellant Tamko Asphalt Products, Inc. ("Tamko") brought an action to quiet title and for injunctive relief alleging that it had a prescriptive easement to use a road crossing property owned by respondents Arch Associates, Herbert M. Katzenberg and Susan B. Katzenberg. Respondents counterclaimed for damages for trespass, declaratory judgment and an injunction. The Circuit Court entered judgment against Tamko on all issues, enjoined Tamko from using the road, and awarded respondents $22,000.00 in actual damages and $100,-000.00 in punitive damages.

We affirm the judgment of the trial court on all issues except the award of actual damages which we remand to the trial court with directions to enter an award of $7,000 in lieu of $22,000.

We adopt the trial court's findings of fact and supplement it by the record where necessary: Tamko owns property located at 425 North Highway Drive in Fenton, Missouri, which it uses as a distribution facility for its roofing products. Respondent Arch Associates Limited Partnership ("Arch") is a Maryland limited partnership, whose general partners are respondents Herbert M. Katzenberg and Susan B. Katzenberg, both of whom reside in Baltimore, Maryland.

The rear gate of Tamko's property opens onto Overmyer Drive, a private road, the eastern portion of which crosses over the southern edge of property owned by C & W Investors ("C & W") directly to the north of the 425 North Highway Drive site ("C & W's portion of Overmyer Drive", referred to as "Parcel 5"); and the western portion of which crosses over the southern edge of property owned by Arch at 2001–2093 Hitzert Court, to the northwest of the 425 North Highway Drive site ("Arch's portion of Overmyer Drive", or "Parcel 4").

Until 1968, both the Arch and C & W sites were owned by D.H. Overmyer. In 1966, in anticipation of the construction of warehouses on the C & W site, D.H. Overmyer granted an easement over the Arch property (Parcel 4) in favor of the owners of the C & W site (Parcel 5), which permitted the latter to use Arch's portion of Overmyer Drive for ingress and egress to their property (the "1966 Easement Agreement"). The 1966 Easement Agreement runs in favor of the owners of the C & W site and their successors and assigns, and runs with and is appurtenant to the C & W site.

Holekamp Lumber Company ("Holekamp") purchased the Tamko site in the early 1960's. Holekamp leased warehouse space from the owners of the C & W site through at least the middle to late 1970's. Holekamp accessed the warehouse space either by Overmyer Drive (pursuant to the 1966 Easement Agreement) or through the back gate of its own property. Holekamp sold the lumberyard to Marian Industries in 1978 and Marian later sold the property to Rimar Building Properties. Tamko purchased the property from Rimar which had ceased operations at the site in July 1982 when it went into bankruptcy.

Prior to purchasing the Rimar site, Tamko's President, J.P. Humphreys, directed John Harness, the real estate agent who had listed the Rimar site, to investigate whether the property had access over Overmyer Drive to the rear gate. Harness testified that he went to "the St. Louis County Records" but found no written easement that "granted rights over Overmyer Drive for access to the back gate".

Harness then called and wrote Herbert Katzenberg to determine whether Katzenberg would grant such an easement to Tamko and, if so, the amount of consideration he would require. Katzenberg responded to Harness's inquiry by letter dated February 4, 1983, stating that he was willing to grant an easement, subject to the rights of the owners and lessees of C & W's property, for $15,000 for five years,

with a refund of $7,500 if the easement were terminated after that period. Humphreys found Arch's proposal to be "absurd" and "facetious" and therefore declined to respond to it.

Thereafter, Tamko purchased the Rimar property in April 1983 for $640,000 with "some risk" because the easement issue was still unresolved. Immediately upon closing on the property, Tamko chained and padlocked the back gate with railroad ties and dirt. The only use made by Tamko of Overmyer Drive until September 1984 was for weekly "security checks" made by Wayne Owens, Tamko's plant manager. Despite barricading the back gate, Tamko sought by virtue of these "security checks" to challenge the owner of the road by asserting a claim of ownership by a presumptive easement.

In September 1984, Tamko elected to reopen its back gate because the City of Fenton began ticketing Tamko's trucks parked on North Highway Drive. After the reopening, Tamko's trucks arriving after business hours would cross Hitzert Court to Overmyer Drive and park next to Tamko's back gate until it was opened for business the next morning. This use of Arch's portion of Overmyer Drive went unnoticed by the respondents.

In early 1987, a representative of Turley Martin, C & W's property management firm, noticed for the first time that trucks belonging to or servicing Tamko were using C & W's portion of Overmyer Drive. Turley Martin's representative, authorized by Judge Munnell, general partner of C & W, notified Tamko that further use by Tamko of C & W's portion of Overmyer Drive was prohibited unless Tamko paid a fee for the use and shared in maintenance of the road. During the course of negotiations with Turley Martin, Tamko never asserted that it had the right to use Overmyer Drive or any portion of it by virtue of an easement. Rather, when Turley Martin threatened "to close off (the) rear access", Tamko acquiesced in Turley Martin's demand and consented by letter agreement dated July 16, 1987 to pay an annual fee of $1,000 and to share in the maintenance of

the road ("1987 letter agreement"). Appended to the agreement was a legal description and a drawing of the portion of Overmyer Drive in question. Tamko paid $1,000 in 1989 and 1990 in renewal of the 1987 letter agreement with Turley Martin. By letter dated April 30, 1990, Judge Munnell, as general partner of C & W, terminated the letter agreement.

On December 6, 1989, respondent Susan Katzenberg, general partner of Arch in charge of the day-to-day management of the Arch property, observed for the first time a tractor trailer marked "Tamko" turning onto Overmyer Drive from Hitzert Court and proceeding to Tamko's back gate. Upon her return to Baltimore, Maryland office the next day, Ms. Katzenberg directed Arch's counsel to demand that Tamko cease using Arch's property for any purpose and that Tamko compensate Arch for any prior trespasses. Despite Arch's counsel's letter of demand and notice dated December 7, 1989, Tamko continued to use Arch's portion of Overmyer Drive at least through the date of the trial at the direction of David Humphreys, general counsel and vice-president of Tamko.

After Ms. Katzenberg saw the trespassing truck the parties began negotiations to resolve the situation. Tamko proceeded to file its petition on December 29, 1989. Arch filed its counterclaim on April 5, 1990. On January 10, 1991, the Circuit Court entered judgment in favor of respondents and against Tamko on all issues. The Court enjoined Tamko from further use of the road, and awarded respondents $22,000 in actual damages and $100,000 in punitive damages. Tamko moved on January 25, 1991 to alter or amend the judgment, which motion was denied February 13, 1991. This appeal follows.

Our standard of review in this court tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the Circuit Court is presumed to be correct and must be affirmed unless this court finds that there is no evidence to support it, that it is against the weight of the evidence, or that it erroneously declares or applies the law. *Id.*, at 32. See

also, *Wojtkowski v. Shelter Ins. Companies,* 702 S.W.2d 74, 76–77 (Mo. banc 1985). In reviewing the judgment, this court should accept as true the evidence and inferences favorable to the prevailing party and disregard any contradictory testimony. *St. Louis County, Mo. v. Oakville Development,* 676 S.W.2d 919, 921 (Mo.App. 1984).

The principal question presented by this appeal is whether Holekamp Lumber's (Tamko's predecessor in interest) use of Overmyer Drive for direct access from Hitzert Court to its rear gate between 1966 and 1976 was adverse or permissive. Before we address this issue, we note that to establish a prescriptive easement, a party must prove that its use of the property was open, continuous, uninterrupted, visible, adverse and under a claim of right of which the property owner had actual or constructive notice for a ten year period. *Bridle Trail Ass'n v. O'Shanick,* 290 S.W.2d 401, 405 (Mo.App.1956); *Tate v. State,* 675 S.W.2d 89 (Mo.App.1984). In addition, the law does not favor the creation of prescriptive easements and therefor Tamko has the burden of proving each of the elements by clear and convincing evidence. *Gill Grain Co. v. Poos,* 707 S.W.2d 434, 437 (Mo.App. 1986); *Meinhardt v. Lauders,* 575 S.W.2d 213, 216 (Mo.App.1978).

Tamko argues that the trial court erred in holding that Holekamp's use of Arch's portion of Overmyer Drive was permissive, because the 1966 Easement Agreement "granted the right to use Overmyer Drive to cross Arch's property only to get to the Munnell property". Tamko asserts that the 1966 Easement Agreement afforded Holekamp, as lessee of C & W, the express right to use Arch's portion of Overmyer Drive to proceed to the warehouses on C & W site, but did not confer an implied right to use Arch's property to reach the adjoining Holekamp lumber yard.

Tamko seeks to demonstrate that Holekamp Lumber made two uses of Overmyer Drive. First, to gain access to the warehouses on the Munnell property and second, for ingress and egress directly to Tamko's own property through its backgate. Tamko agrees that the first use was permissive because the 1966 Easement Agreement benefitted Munnell and his lessees. The second, contends Tamko, was not permitted by the 1966 Easement Agreement expressly or by implication.

There is no Missouri case to support Tamko's theory on appeal. Therefore, Tamko, in support of its contention, relies on 25 Am.Jur.2d *Easements and Licenses,* Section 77 (a grant or reservation of an easement "to pass on a private way to one lot does not confer the right to pass further on the same way to another lot") and 28 C.J.S. *Easements,* Section 92, which reads as follows:

> An easement can only be used in connection with the estate to which it is appurtenant ... Accordingly, a right of way cannot be used by the owner of the dominant tenement to pass to other land or premises adjacent to or beyond that to which the easement is appurtenant, and so cannot be extended by him ... *to accommodate persons doing business on other lots than the ones to which the easement is appurtenant....* [W]here the owner of a right of way appurtenant to a certain tract uses it for the period of prescription *as appurtenant also to another tract,* he gains a *prescriptive right to such enlarged use.*
>
> (emphasis added)

The principle espoused in Sec 92, C.J.S., *supra,* has been applied in *McBrayer v. Davis,* 307 S.W.2d 14 (Ky.1957). Tamko relies upon *McBrayer* to advance its position that the express right to use Overmyer Drive to get to Parcel No. 5 does not confer an implied right to use Overmyer Drive to get to the adjoining Holekamp lumber yard.[1] In *McBrayer,* a common grantor of

---

1. Tamko cites to *Bickler v. Bickler,* 403 S.W.2d 354 (Tex.1966) and an array of cases from other jurisdictions disallowing the extension of easements. Tamko asserts that each of the cases stand for the proposition that the use made by

Tamko's predecessors in interest, i.e. Holekamp, Marion and Rimar, for access to the lumber yard was different from and beyond that authorized by the 1966 Easement Agreement, which

the easements divided her property into lots representing a real estate development plan. After such division, the lots were sold under deeds whereby the purchasers and the vendor were given the right to use a certain roadway "as now established." *McBrayer, supra,* at 16. The grantor's heirs and assigns and the purchasers and their successors were entitled to use the roadway as a passway and as a means of ingress and egress. *Id.* An attempt was made by the dominant estate owner to extend the existing easement further than its express terms warranted. The court held that none of the parties could enlarge and extend the use of the roadway to reach property not a part of the original subdivision. *Id.*

The case at bar is distinguishable in that the 1966 Easement Agreement contains an unrestricted easement over Parcel 4: "for the purpose of ... utilizing a roadway for ingress and egress to Parcel 5 ... [which] easement runs with and is appurtenant to Parcel 5 ..." Tamko presented no evidence to establish that the easement over Parcel 4 was used by Tamko's predecessors for anything other than ingress and egress to Parcel 5. The 1966 Easement Agreement granted to the owners of Parcel 5, their successors and assigns, the right to use Arch's portion of Overmyer Drive for ingress and egress *to* Parcel 5. Further, the eastern portion of Overmyer Drive leading to the Holekamp lumber yard is on Parcel 5. The 1966 Easement Agreement expressly grants to those benefitted by it the right to access to all of Parcel 5, including that portion of Overmyer Drive directly adjacent to Tamko's back gate. To access the Holekamp property, Tamko's predecessors did not need to "pass further" on Overmyer Drive than permitted under the 1966 Easement Agreement. The fact that permitted users departed Parcel 5, of which they were permitted users as lessees, to go to an adjoining parcel would not defeat their permissive right to use Parcel 4 to get to Parcel 5.

In its Conclusions of Law the circuit court held that:

No prescriptive easement existed in favor of Tamko over Arch's portion of Overmyer Drive at the time it purchased its Fenton site. Any and all use of Overmyer Drive by Holekamp Lumber from 1966 through 1975 at the earliest was permissive and therefor neither adverse nor under a claim of right. As a lessee of the C & W property, Holekamp benefitted from the 1966 Easement Agreement and thus was a permitted user of both C & W's and Arch's portions of Overmyer Drive. *See, e.g.,* 28 C.J.S. *Easements,* Section 90; *Phelps v. Fitch,* 255 S.W.2d 660, 662 S.W.2d (Ky.App. 1953).

■ This court adheres to the general principle in 28 C.J.S. *Easements,* Sec. 90,[2] referred to by the *Phelps* court. *Phelps* stands for the proposition that "a lessee of a dominant estate is entitled to the use of easements legally appurtenant to the demised premises and reasonably necessary to their enjoyment." *Phelps, supra,* at 662 (citation omitted). As a lessee of Parcel 5, Holekamp was a permitted user of all ways appurtenant to that property, reasonably necessary to their enjoyment. Because Holekamp's use of Overmyer Drive was permissive in its origin, that use remained permissive until a distinct and positive assertion of a right hostile to Arch and C & W, as owners of the road, was brought home to them. *Meinhardt,* 575 S.W.2d at 215; *Tate v. State, supra* at 89. The trial court found that Tamko made no affirmative assertion of a right hostile to either Arch or C & W. See, *infra.*

■ Even if Tamko had successfully established that Holekamp had affirmatively

---

granted access across the Arch property by its express terms only "to Parcel 5."

This court does not consider it necessary to delve into a lengthy discussion of cases from other jurisdictions because we believe that Tamko's predecessors in interest were permitted users of the roadway.

2. "... [W]here a way is appurtenant to an estate, it may be used by those who own or lawfully occupy any part thereof, and by all persons lawfully going to or from such premises, whether they are mentioned in the grant or not...."

asserted a right to use Arch's portion of Overmyer Drive immediately upon the expiration of Holekamp's lease with C & W, the earliest that the ten-year prescriptive period could have begun is 1976. It is undisputed that Rimar ceased operations at the 425 North Highway Drive site in July 1982, and did not resume operations at any time before selling the property to Tamko. This six year period, however, is insufficient to establish a prescriptive easement. The circuit court did not commit a fundamental error in declaring and applying the law. Tamko did not have a prescriptive easement existing at the time it purchased the property and accordingly, Tamko's point is denied.

In its second point Tamko alleges trial court error in finding that Holekamp's use of Overmyer Drive for direct access to its back gate was not open, visible, notorious, continuous, uninterrupted and sufficient to afford constructive notice to Arch.

At trial, Tamko established through the testimony of at least two witnesses that, from 1966 to 1982, Holekamp Lumber, Marion Industries and Rimar Building Products, its predecessors in interest, used Overmyer Drive for direct access to the back gate of the lumberyard. Edward Froesel, who worked as a warehouseman for Holekamp, Marion and Rimar, testified that several vehicles (including pick-up trucks, straight lumber trucks and a few tractor trailers) crossed over Overmyer Drive to gain access directly into and out of the back gate, without going to the warehouse on Parcel 5. Carl Holekamp, president of Holekamp Lumber since 1960 until its sale to Marion Lumber in 1978, likewise testified that several trucks made use of Overmyer Drive to gain access directly to the back gate.

For the respondents, Herbert Katzenberg (general partner of Arch) testified that he was aware that Holekamp was leasing warehouse space on Parcel 5 and that "most of their traffic was between the Judge's warehouse through their back gate and it never concerned me because I knew that they had a lease on the Judge's property." Neither Susan nor Herbert Katzenberg testified that Arch had any knowledge of Holekamp's use of Overmyer Drive for direct access to its back gate.

▮ The trial court found that Holekamp's use of Arch's portion of Overmyer Drive for direct access to its back gate at the time it used the road for access to the C & W warehouse space was not open, visible or continuous. Tamko cites to *Moravek v. Oscody*, 456 S.W.2d 619 (Mo.App.1970), where the court found the evidence to clearly establish that the land used by the claimant's was open and "... traveled at such times by the users as their convenience and business needs required, hence it must be considered continuous." *Id.*, at 625. The *Moravek* court also found that the owners of the dominant estate graded the roadway, put gravel on it, and performed acts establishing a claim of right. *Id. Moravek* is of no assistance to Tamko. All Tamko has established is continuous use, which alone, does not create a prescriptive right. *Eakins v. Sadler*, 683 S.W.2d 303, 306 (Mo.App.1984); *Chase v. Fania*, 675 S.W.2d 87, 89 (Mo.App.1984).

▮ Based upon the evidence at trial, the trial court could reasonably have concluded that Arch (and C & W) considered all use by Holekamp to be permissive because it was a lessee of C & W's warehouse. In addition, the Katzenbergs could hardly be required to determine whether Holekamp's trucks using Overmyer Drive came from the C & W warehouse or from the Holekamp property. Conflicts in the evidence are for the trial court to resolve and we must defer to the judgment of the trial court on matters of credibility. *Cook v. Burke*, 693 S.W.2d 857, 860 (Mo.App.1985).

▮ To establish a prescriptive easement the claimants must show notice not just of mere use, but of use made under a claim of right. Tamko asserts that the testimony of Herbert Katzenberg (that he was aware of the traffic through Holekamp Lumber's back gate), is sufficient to establish constructive notice to respondents of the use made by Tamko. Tamko, in support of this assumption, cites to *White v. Ruth R. Millington Living Trust*, 785 S.W.2d 782 (Mo. App.1990) where the court held that notice

to the owner would be implied from the use because an owner is charged with constructive notice of such facts as would put him on actual notice if he were present when the use occurred. *White, supra,* at 786. What Tamko fails to recognize is the overwhelming evidence present in *White,* to support property owner's constructive knowledge of adverse use of roadway across her property. *Id.,* at 787. Moreover, property owner's family members acknowledged existence of the roadway, which was well-defined. *Id.* In addition, the property owner had on several occasions placed barbed wire across the road because she could "see where cars were pulling in." *Id.*

■ The case *sub judice* is inapposite and presents a perfect example of why the law provides that use that is permissive in its origin remains so until a distinct and positive assertion of a right hostile to the owners is brought home to them. *Oberle v. Monia,* 690 S.W.2d 840, 844 (Mo.App. 1985); *Meinhardt, supra,* at 215; *Eakins, supra,* at 306 (even though the owners knew of some of plaintiff's use of their road and made no objection, they were not charged with notice because no assertion of an adverse claim or of claim or right had been made).

■ Without the requirement of an express assertion, property owners would be required to maintain an impossible degree of vigilance to discern the motive and purpose behind each traversing of their property. In the present case, far from asserting a right to use Overmyer Drive, when confronted by Judge Munnell in 1987 about its use of the road, Tamko began paying for the right to traverse C & W's portion of Overmyer Drive. Tamko never made any assertion of its right to use the road. The circuit court's findings were supported by the evidence, Tamko has not met its burden of proving each of the elements by clear and convincing evidence. *Gill Grain Co. v. Poos,* 707 S.W.2d at 437; *Meinhardt, supra,* at 216. Tamko's second point is denied.

In its third point Tamko alleges error in the circuit court's finding that Tamko aban-

doned any existing prescriptive easement by closing the back gate for a period of about 17 months after Tamko acquired the property. We have already determined *supra* that Tamko did not have a prescriptive easement existing at the time it purchased the property. Therefor, we need not address this issue.

In its fourth point, Tamko voices circuit court error in awarding punitive damages on Arch's counterclaim for continuing trespass. Tamko asserts there was no substantial evidence of an evil motive or reckless indifference to Arch's rights by Tamko because Tamko's use of the road was pursuant to counsel's advice and based upon facts known to it before, during and after trial, and amounts to at worst, a good faith mistake of law.

■ The award of punitive damages results from outrageous conduct propelled by an evil motive or reckless disregard or indifference to the rights of others. *Walker v. Gateway Nat. Bank,* 799 S.W.2d 614, 617 (Mo.App.1990); Restatement (Second) of Torts, sec. 908(2) (1979); *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989). We are aware that where a party acts in good faith and honestly believes that his act is lawful, he is not liable for punitive damages. *Walker, supra,* at 617 (citation omitted).

Tamko does not contest the amount of the punitive damage award and seeks to shield its entire conduct by asserting reliance on counsel and good faith mistake of the law. Tamko stresses that if we affirm the judgment of the trial court on the easement issue, we should not impose punitive damages based on Tamko's incorrect analysis of its legal rights.

■ Most of Tamko's point relied on rehashes the law regarding Tamko's assertion of an easement by prescription. We have examined this issue at length in Point 1. There is ample evidence in the record to support the trial court's award of punitive damages. Relevant to our discussion is the fact that no Tamko witness testified that prior to purchasing the property, Tamko analyzed Holekamp's rights under the 1966 Easement Agreement or that Tamko distin-

guished between adverse and permissive use of Overmyer Drive. Indeed, neither Harness, J.P. Humphreys, Ed Froesel nor Wayne Owens testified that they were aware of the 1966 Agreement—despite a copy of the same in Tamko's files. David Humphreys, Tamko's general counsel, who testified solely on the issue of punitive damages, testified that he had not even read the 1966 Easement Agreement although he admitted it would be important in determining the parties' rights to use Overmyer Drive.

We can reasonably conclude that prior to purchasing the property, Tamko did not embark on a thorough investigation to know why its predecessors were granted permission to use the roadway. Tamko's president J.P. Humphreys, testified that Katzenberg's offer of a five-year easement for $15,000 to benefit property for which Humphreys paid $640,000, was "absurd" and "facetious". Humphreys testimony also depicts the following:

Q: (respondents counsel) Did you ever tell anyone prior to the time that you closed on your property that whether you would go forward with the purchase of the property was dependent upon a resolution of the easement issue to your satisfaction?

A: I don't think so.

Q: (respondents counsel) Because it wasn't in your mind. Whether you got it or not didn't matter to you?

A: No. You know, we can still be alive today if we hadn't bought it.

Upon purchasing the property from Marion Industries, with the easement issue unresolved and "in the air", Tamko proceeded to block off the rear gate with debris and railroad ties. Humphreys testified that this blockade, done on the advice of counsel, constituted a "challenge" to the property owners.

Other evidence in the record to support Tamko's reprehensible conduct and evil state of mind comes from the internal letter from Wayne Owens (Tamko's warehouse manager). Mr. Owens testified that he conducted security inspections in his personal truck at the close of business every Friday from May 1983 until July 1984, when access to the rear gate had been blocked off by Tamko. This letter contains handwritten entries made by J.P. Humphreys or some other Tamko executive which list some of the elements of a prescriptive easement and concludes: "KATZENBERG WILL MAKE CLAIM." Rather than confronting Katzenberg, Tamko chose instead to trespass on the Arch property until Katzenberg found out and made a claim.

The trial court's findings [3] reveal that Tamko's actions were motivated by an evil mind and desire to infringe on Arch's property rights and obtain by stealth that which it did not wish to pay for. The testimony presented at trial reflects a commercial entity out to infringe upon and grab its neighbor's property rights by deceitful means. Accordingly, after hearing all the testimony, the trial court correctly concluded that Tamko's actions were not taken in good faith but justified an award of punitive damages. Point denied.

Tamko, in its ultimate point on appeal, alleges trial court error in awarding $22,000 actual damages to respondents, based on their trespass claim. Tamko suggests that if we affirm the judgment of the trial court the award of actual damages should be reduced to $7,000. Tamko's argument is twofold. First, Tamko argues that the statute of limitations, § 516.120(3) R.S.Mo 1986, bars any damages for trespasses committed more than five years prior to the filing of respondents counterclaim. Second, Tamko alleges that if we conclude that a legal right to occupy Parcel No. 5 grants an adjacent property owner the right to use a private roadway to get to its own property under the 1966 Easement

---

3. The Circuit Court found that Tamko's trespasses onto Arch's property:

... were outrageous because of Tamko's evil motive or reckless indifference to Arch's rights. The repeated trespasses on Arch's property were intentional violations that were orchestrated by Tamko in a way to conceal them in order to further Tamko's own business interests and with reckless disregard of Arch's rights. The Court finds that it is important that Tamko be punished for its conduct in an amount which will deter it and others from engaging in similar conduct.

Agreement, then by virtue of Tamko's agreement with Turley–Martin (Property Managers for Parcel No. 5) on August 5, 1987, Tamko committed no trespass on respondents property after the said date.

We first address the statute of limitations argument. Respondents counterclaim was premised on a theory of continuous trespass performed by Tamko on Arch's portion of Overmyer Drive from June 24, 1983, when Wayne Owens "security checks" commenced, to the date of trial, i.e. December 29, 1989. On appeal, respondents, citing to § 516.100 R.S.Mo 1986, state that the limitations period did not begin to run until the trespasses were discovered by Susan Katzenberg on December 7, 1989.

▪ Tamko, in its answer to the counterclaim states that actual damages prior to December 29, 1984, is barred by § 516.-120(3), which provides that "an action for trespass on real estate" shall be instituted within five years. On appeal, Tamko contends that the statute of limitations bars damages five years prior to the filing of the counterclaim, i.e. April 5, 1990, *Northwest Radiation Oncology v. Goodstal*, 735 S.W.2d 762 (Mo.App.1987). In effect, Tamko is arguing that the cut-off date for damages is April 5, 1985 and not December 29, 1984 (the date mentioned in Tamko's answer).[4] Additionally, Tamko asserts that respondents are not prejudiced by this technical *faux pas* in dates.

The reasoning of the court in *Southwestern Bell Telephone Co. v. Buie*, 758 S.W.2d 157 (Mo.App.1988) aids Tamko's position in that Tamko has satisfactorily pleaded the particular statute upon which it relies. 758 S.W.2d at 161. Moreover, in *Northwest Radiation Oncology v. Goodstal, supra*, the court in unequivocal terms proclaimed that where the counterclaim seeks affirmative relief rather than a mere set-off or recoupment against the plain-

tiff's claim, the running of the statute of limitations on the counterclaim is tolled when it is filed rather than when the original petition is filed. 735 S.W.2d at 766. As a result, we agree that the cut-off date for damages was April 5, 1985 and respondents are not prejudiced thereby.

▪ Second, the agreement between Turley–Martin and Tamko afforded Tamko the right to use the roadway for a fee of $1,000 per year plus payment of a share of the cost of maintenance. The agreement constituted a license, granting Tamko as a licensee "the privilege to go onto the premises for a certain purpose ..." *Annin v. Lake Montowese Dev. Co., Inc.*, 759 S.W.2d 240, 241 (Mo.App.1988). We are cognizant of Missouri law which states that a license does not vest in the licensee any title, interest or estate. *Annin, supra*, at 241, *State ex rel. State Highway Commission v. Johnson*, 592 S.W.2d 854, 857–58 (Mo.App. 1979).

▪ Earlier in Point 1, we disagreed with Tamko's theory concerning the extension of easements. We chose to adopt the court's ruling in *Phelps v. Fitch*, where the court was confronted with the question of who had the right to use an easement for a right of way appurtenant to a particular property. The *Phelps* court stated it was immaterial whether the person's interest in the dominant estate "is a fee simple title, a leasehold interest or a mere license," he has the right to use the easement if he is lawfully on the property. *Phelps v. Fitch*, 255 S.W.2d at 662. In addition, 28 C.J.S. *Easements*, section 90 provides that a way appurtenant to a piece of property "may be used by those who own or *lawfully occupy any part thereof* ..." (emphasis added). Respondents have not cited a Missouri case ruling that a licensee would be placed in a disadvantageous position from a lessee with regard to use of an easement, once he is lawfully on the dominant estate.

---

**4.** Respondents claim that Tamko's answer does not mention the statute of limitations being tolled on the filing of Arch's counterclaim. As a result, Tamko has waived its affirmative defense with regard to the damages accruing between December 29, 1984 and April 5, 1985.

Tamko retorts that:

If Arch is suggesting that Section 516.120(3) should not be applied because of the failure of its absentee owners to learn of the existence of the use of the road due to fraudulent concealment, that is in itself an affirmative avoidance of an affirmative defense which should have been pleaded under Rule 55.01. We agree.

Consequently, Tamko was a lawful occupier of a part of Munnell's property as a licensee from August 5, 1987 until April 30, 1990.[5] The trespass unto respondents property occurred from April 5, 1985 to August 5, 1987. The trial court awarded respondents actual damages of $22,000, the amount specified in respondents post-trial brief. The sole evidence presented by respondents with regard to the damages was the lost rental value of the roadway. Herbert Katzenberg testified that he placed this figure at $3,000 per year for the first five years (i.e. 1983–1988) and $3,500 for the last two years.

Accordingly, the actual damages are reduced from $22,000 to $7,000 representing the reasonable rental value of the road for the period April 5, 1985 to August 5, 1987.

The judgment of the trial court is affirmed on all issues save the award of actual damages which we remand to the trial court with directions to enter an award of $7,000 in lieu of $22,000 for actual damages.

STEPHAN and CRIST, JJ., concur.

---

**5.** On April 30, 1990, Munnell terminated the Turley–Martin Agreement with Tamko as of April 30, 1991.