BRICK HOUSE CAFE & PUB, L.L.C.,
and FlatHD Properties, L.L.C.,
Respondents,

v.

Stuart A. CALLAHAN d/b/a Callahan's
Body Shop, Appellant.

No. WD 63023.

Missouri Court of Appeals,
Western District.

Oct. 12, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 21, 2004.

As Modified Dec. 21, 2004.

Bruce Brandom Brown, Kearney, MO, for Appellant.

Anthony Asher Stein, Kansas City, MO, for Respondent.

Before RONALD R. HOLLIGER, P.J., ROBERT G. ULRICH, and JAMES M. SMART, JR., JJ.

PER CURIAM.

Stuart Callahan appeals an order granting a prescriptive easement over a portion of his property to Brick House Café & Pub, LLC, and FlatHD Properties, LLC ("Respondents" or collectively "Brick House") and issuing an injunction against the construction of a fence to enclose his property. Because we determine that Brick House failed to prove by clear and convincing evidence that the use of the property by Brick House and its predecessors-in-title was adverse to Callahan and its predecessors-in-title for the entire 10–year prescriptive period, we reverse the judgment of the trial court and remand the case for disposition of the bond.

## Factual Background

Callahan and Brick House own properties in Smithville, Missouri. Callahan's

property is surveyed as consisting of Lot 2 and part of Lot 1, Block 4 of the Original Plat of Smithville. Brick House's property consists of the south parts of Lots 3 and 4 of Block 4. For convenience we will sometimes refer to the Callahan property as "Tract C" and the Brick House property as "Tract B." Tract B and C are adjacent tracts, with each tract having a commercial building. Part of each tract consists of a broad alleyway. The property line is near the center of the alleyway.

In 1922, Collins C. Kindred and Elizabeth Kindred originally acquired both properties. For many years, the Kindred family operated a car dealership on the site, which consisted of several different buildings and a gravel alleyway running between those buildings. The title histories of the respective properties were poorly developed at trial, leaving gaps in the record of ownership. The deeds transferring title from Mr. and Mrs. Collins C. Kindred to others were not presented. The parties agree that the properties were transferred to "family" of the Kindreds. The record does not indicate when these transfers occurred or the exact identities of the transferees. The record shows only the identities of the family members who later were grantors of the respective tracts at the time of the transfers out of the family.

Callahan purchased his property in January 1996 from Holimon and Brandes, who earlier had acquired it from the Kindred family. The operators of Brick House, Ronald and Phyllis Miller, purchased their property in December 1995. Callahan operates a body repair shop on his property ("Tract C" or the "Callahan property"). The back of his shop faces the back of the building on Brick House's property ("Tract B") which houses a restaurant and drinking establishment called Brick House Café & Pub. Before Callahan bought Tract C,

he occupied Tract B as a tenant. The record fails to reveal how long Callahan occupied Tract B.

Prior to the dispute that led to this action, the alleyway regularly had been used for many years by various people, including the prior owners of the property, their tenants, drivers of delivery vehicles and trash trucks, and customers. Brick House stores its trash dumpsters in the alleyway. There was testimony at trial that the truck drivers cannot service these dumpsters without using Callahan's portion of the alleyway. Two other properties (to the north of Brick House) also extended into the alleyway: a Masonic lodge, which is located on the same side of the alley as the Brick House property, and a building that was formerly a theater located in between the Brick House property and the Masonic Lodge. The alleyway is in the rear of all four buildings (the Brick House restaurant, the Callahan body shop, the lodge, and the theater). The alley sits on the western part of Lot 2 and the eastern part of Lot 3 (belonging to Brick House and also the two other property owners on the northern part of Lot 3). The alleyway is approximately forty-six feet wide.

Sometime in late 1999, or in early 2000, more than five years after he purchased his property, Callahan informed Respondents of his intention to build a permanent fence along the property line separating his property from their property. The fence line would have been essentially down the middle of the alley. Callahan had several stated reasons for wanting to erect the fence, but at least part of it was related to the fact that the City of Smithville refused to allow Callahan to park and store his damaged body shop vehicles in the alley unless the vehicles were enclosed by a fence.

Brick House filed suit in the Clay County Circuit Court to stop Callahan from erecting the fence. Brick House claimed that such an action would cause the restaurant to close because of its reliance upon the use of the alleyway for access to its dumpsters. On June 13, 2000, the court granted a preliminary injunction. On April 2, 2001, following a trial, the court issued a permanent injunction enjoining Callahan from erecting a fence or any other type of obstacle to prevent Brick House's use of the alleyway.

Callahan appealed to this court. *Brick House Café & Pub, L.L.C. v. Callahan,* 83 S.W.3d 43 (Mo.App.2002). Due to ambiguities in the trial court's judgment making review difficult, this court declined to review the propriety of the injunction. *Id.* at 45. This court concluded that the trial court's findings suggested that the injunction could be based on a prescriptive easement, an implied easement, or an easement by necessity. *Id.* at 47. Thus, this court remanded the case to the trial court for review and clarification of its basis for granting the injunction. *Id.* This court gave authority to Brick House to amend its theories and even allowed Brick House to present additional evidence. On remand, Brick House declined to specifically plead other theories beyond that of prescription, and declined to present additional evidence. The trial court allowed Respondents "to amend to conform with proof previously adduced." The trial court then again found that Respondents were entitled to a prescriptive easement over Callahan's portion of the alleyway and again granted a permanent injunction enjoining Callahan from preventing Respondents' use of the alleyway. The decree again includes factual recitations suggesting elements of other easement theories, but the only theory specifically mentioned is that of a prescriptive easement.

On appeal, both parties address the issues as though the case is strictly about easement by prescription, rather that easement by any other theory.

This appeal follows.

### Analysis

*Murphy v. Carron* governs our review of a court-tried case. 536 S.W.2d 30 (Mo. banc 1976). We must affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *See id.* at 32. Because the parties failed to request specific findings, we resolve all fact issues in accordance with the result reached. Rule 73.01.

### Adverse Use of Alleyway

In his first point on appeal, Callahan argues that the trial court erred in granting Respondents a prescriptive easement over his portion of the alleyway. According to Callahan, Respondents failed to establish an essential element of their claim—that the use of the alleyway was adverse for a period of ten years.

To establish a prescriptive easement over another's property, a party must show that its use of the property has been continuous, uninterrupted, visible and adverse for a period of ten years. *Whittom v. Alexander–Richardson P'ship,* 851 S.W.2d 504, 508 (Mo. banc 1993). "That period can be reached by a single continuous, uninterrupted adverse use for ten years or more or by 'tacking' together several of such uses, each of which may be less than the ten years but their total amounting to ten years or more." *Johnston v. Bates,* 778 S.W.2d 357, 361 (Mo. App.1989).

The law does not favor the creation of prescriptive easements. *Tamko*

*Asphalt Prods., Inc. v. Arch Assocs.*, 830 S.W.2d 434, 438 (Mo.App.1992). Therefore, the party seeking to acquire the prescriptive easement must establish each of these elements by clear and convincing evidence. *Id.*

Here, Brick House had owned its property only five years when it filed its petition. Thus, Brick House could not meet the ten-year prescription period without "tacking" onto adverse use by the prior ownership. In granting Brick House the prescriptive easement, the court found that "[Brick House] and their predecessors-in-interest have had trash trucks drive over [Callahan's] portion of the alleyway for more than ten years."

■ Under the law of prescriptive easements, the fact that the property has been used by one party and its predecessors for ingress and egress is not sufficient by itself to create a right to a prescriptive easement. In order to tack together these uses, the party seeking the declaration of the easement must show that the use (both its use and its predecessors' use) was adverse to the claimed property rights of the other party.

■ Adverse use does not require a heated controversy or a manifestation of ill will. *Jacobs v. Brewster*, 190 S.W.2d 894, 899 (1945). Nor is it necessary that the user intend to violate the owner's rights. *Johnston*, 778 S.W.2d at 362. Rather, use is adverse if it proceeds without recognition of the owner's authority to permit or prohibit the continued use of the land. *Id.* Adverse use is often indirectly proved. *Whittom*, 851 S.W.2d at 509. There is generally a presumption of adverse use where the respective properties have been in different hands during the prescriptive period and the use has been open and continuous. *See Gault v. Bahm*, 826 S.W.2d 875, 881 (Mo.App.1992). However, if there is a period of permissive use during this time frame, the use is not continuously adverse. *See Homan v. Hutchison*, 817 S.W.2d 944, 948 (Mo.App.1991). Accordingly, the mere fact that Brick House and its predecessors used the alleyway for ingress and egress is not by itself sufficient to create a prescriptive easement. Instead, it must show that the use of the property was *adverse* to the interests of Callahan and its predecessors-in-title.

### Tract B History

The record reflects the following as far as the title history of the Brick House property:

- According to a recorded deed, on December 22, 1922, the property was conveyed to Collins C. and Elizabeth Kindred.
- According to testimony of Collins F. Kindred (the son of Collins C. Kindred), at some point (some unspecified date) the property was conveyed from Mr. and Mrs. Collins C. Kindred to "family."
- According to a recorded deed, on December 13, 1995, the property was conveyed from Collins F. and Loula Kindred, Charles and Wilma Kindred, Frances Durham, and Joan and George Beatty (Grantors) to Ronald and Phyllis Miller (Grantees).[1]
- According to a recorded deed, in 1997, the Millers (who operate the Brick House Café) transferred title of the property to their corporation, FlatHD Properties, LLC.

### Tract C History

The record reflects the following as far as the title history of the Callahan property:

1. There was another grantee, Jones, who later released his interest to the Millers.

· According to testimony of Collins F. Kindred, the property was acquired by Collins C. and Elizabeth Kindred around 1920.

· According to testimony of Collins F. Kindred, the property also was transferred from Mr. and Mrs. Collins C. Kindred to "family" at some unspecified point in time.

· According to a recorded deed, on April 1, 1993, part of Tract C (part of Lot 1 and all of Lot 2) was conveyed from Charles and Wilma Kindred to Holimon and Brandes.

· According to a recorded deed, on April 18, 1994, another part of Tract C (part of Lot 1) was conveyed from Charles and Wilma Kindred, Francis Durham, and George and Joan Beatty to Holimon and Brandes.

· According to recorded deeds, on January 25, 1996, the remaining part of Tract C (all of Lot 2 and part of Lot 1) was conveyed by Holimon and Brandes to Brandes, and then from Brandes to Callahan.

In sum, the Millers acquired Tract B in 1995, and Callahan acquired Tract C in 1996. We know the Kindred "family" owned the two properties before those respective dates, and we know who the grantors were on the deeds in 1995 and 1996. We also know that Brandes and Holimon owned part of Tract C for approximately three years before the transfer to Callahan.

■ The law requires ten years of adverse use to acquire prescriptive rights. *Moss v. Ward,* 881 S.W.2d 238, 241 (Mo. App.1994). Here, the ten year period on which Brick House relies included January 1990 and thereafter until Callahan acquired ownership in June 1996. Therefore, we must examine the history and usage during that period in order to see if the use of the property was "adverse" to the ownership interests of Callahan and his predecessors-in-title from January 1990 to January 2000.

All that we can discern from the above record is that at some point—presumably prior to January 1990,—Mr. and Mrs. Collins C. Kindred transferred some of the property to "family." Until 1993, the "Kindred family" owned all of the property in question. Apparently, Tract B and Tract C were in different forms of family ownership. We know that, as for the Callahan property, in April 1993, the part of Tract C on which part of the alley sat was conveyed by Charles and Wilma Kindred (son and daughter-in-law of Collins C. and Elizabeth) to Brandes and Holimon. Thus, we assume the property was owned by Charles and Wilma for some time prior to the 1993 transfer.

As for Tract B, we know that, as of December 1995, the property was conveyed by Charles and Wilma Kindred, Frances Durham (daughter of Collins C.), Joan Beatty and George Beatty (daughter and son-in-law of Collins C.), and the Collins F. and Loula Kindred living trust. We know this only because they are listed as *grantors* on the deed. We know nothing about the nature of the ownership or the relative shares of ownership. The record fails to disclose why there was no attempt to offer copies of deeds by which title was acquired (or any other evidence of ownership) pertinent to the time when the property was divided, showing the respective grantees and the dates of transfer.

Brick House argues that the above owners of Tract B (which include Charles and Wilma Kindred, who were also presumably part owners of Tract C) could have used the alley in a way that was adverse to the possessory interests of the owner of Tract C (Charles and Wilma Kindred). Brick

House also suggests we can *assume* that the ownership was always the same from January 1990 to the respective transfer dates to Brick House and Callahan. We are not convinced that offering that assumption by inference is the same as offering *proof* by clear and convincing evidence. *See Tamko*, 830 S.W.2d at 438. In any event, the problem here is that although the owners of Tract B, who apparently leased the property during part of the time in question to Callahan, *could theoretically* have used the alley in a way that was adverse to the owners of Tract C (including Charles and Wilma), the only thing we know is that the usage occurred; we have no information about whether the usage was permissive or adverse. Nor, for reasons discussed more fully below, is it clear that facts were shown that could give rise to a presumption of adverse usage.

The testimony of Collins F. Kindred that both of the properties at some point belonged to the "family" does nothing to prove that the usage was adverse. In fact, it tends to suggest that the use was permissive because of the family closeness of the property owners. Callahan seizes on this very point, contending that the predecessors-in-interest's use of any portion of the alleyway would not be adverse if the family owned both properties, but rather would be presumed to be permissive. Callahan also is correct that from 1990 to 1993 there was overlap in ownership. Charles and Wilma Kindred had an ownership interest in *both* of the pertinent tracts. He argues, therefore, that Brick House cannot tack its use of the alleyway onto its predecessors' use.

 Brick House completely ignores the doctrine that the presumption of adverse usage that arises out of long and continuous use of another's land does not apply when there is a family relationship between the owners of the respective tracts. *See Tallent v. Barrett*, 598 S.W.2d 602, 606 (Mo.App.1980). The proponent of the prescriptive easement can still prove that the use actually *was* adverse; the proponent simply does not have the benefit of a presumption in such a case. *See id.* Here, as we have noted, not only was there a family relationship, but it is also possible that Charles and Wilma had a major or controlling interest in *both* properties during that period. The only oral testimony pertinent to ownership was that of Collins F. Kindred, who described both properties as belonging only to "family." Mr. Kindred did not provide evidence that usage was adverse.

Because we do not have the pertinent deeds by which "family" received title from Collins C. and Elizabeth Kindred, we do not know how the respective interests of the owners of Tract B appeared. For instance, we do not know whether Charles and Wilma had a one percent interest as tenants in common with the other (apparent) owners, a ninety-five percent interest as tenants in common, or an interest in the entirety as joint tenants. Again, we know only the identities of the persons who conveyed the property out of the family. Thus, it is impossible to say that there was clear and convincing evidence of facts that would give rise to a presumption that the use by the owners of Tract B would have been adverse rather than permissive. Even though we must resolve factual disputes in accordance with the result reached, we cannot manufacture any facts that are not part of the record.

 "Since a person cannot claim adversely against himself, the prescriptive period does not begin to run while the dominant and servient tracts are under the same ownership or control." 25 AM.JUR. 2d *Easements and Licenses* § 49 (1996). Here, while ownership of the dominant and servient tracts was different for part of the

ten-year period, the difference in ownership for the balance of the period has not been clearly demonstrated. "[A]ny doubt as to the character of the use is to be resolved in favor of the free and untrammeled use of the land." *McIlroy v. Hamilton*, 539 S.W.2d 669, 673 (Mo.App.1976). Here, where the basis for a prescription of adverse usage was not shown, there is doubt as to whether use was permissive or adverse.

On appeal and in the trial below, Brick House has relied exclusively on the theory of prescriptive easement to justify the injunction. We are offered no other theory or basis on which to support the trial court ruling. However, for the reasons mentioned above, the record simply is too sparse to support a prescriptive easement.

When this court remanded the case for greater specificity as to the theory or theories supporting the injunction, the court was allowing Brick House to re-plead the case, and present additional evidence if necessary. Plaintiff was not required to elect a single theory, except to the extent theories were inconsistent with one another. *See Whittom*, 851 S.W.2d at 509 (error to require plaintiffs to elect between theories of prescriptive easement and common law dedication). *Id.* The remand directing the trial court to allow amendment of pleadings and to take additional evidence gave great latitude to Brick House to correct deficiencies in pleadings and evidence.

The testimony of Miller (operator of Brick House Café) as to his belief that the City owned the alleyway was also not helpful to a theory of *prescriptive* easement in view of extant authority suggesting that such a belief cannot support the adverse usage necessary to a prescriptive easement. *See Rosemann v. Adams*, 398 S.W.2d 855, 858 (Mo.1966) (one cannot acquire prescriptive rights if one believes the government owns the property for the benefit of the public). Accordingly, this testimony was another strike against the notion that easement by prescription was established.

On remand, Brick House chose to stick with a theory of prescription, and to abandon other potential theories of easement. For the reasons mentioned, there is no substantial evidence to support a finding of adverse usage for ten years. We have no choice but to reverse the injunction. Point I is granted.

In view of our ruling on Point I, Points II and III, which relate to the injunction, are moot.

■ In his final point on appeal, Callahan challenges the portion of the court's judgment releasing Brick House from the injunction bond. Brick House filed a bond in the amount of $10,000.

Section 526.070 requires a party seeking a temporary injunction to execute a bond that secures the payment of appropriate damages in the event the injunction is dissolved. Here, our reversal of the injunction permanently enjoining Callahan from building the fence also requires reversing the portion of the judgment releasing and discharging the bond. Therefore, we reverse the judgment in its entirety. Point IV is granted. We remand for a hearing on the assessment of damages on the injunction bond. *See* § 526.200.

## Conclusion

For the foregoing reasons, we reverse the trial court's judgment granting the injunction. We remand the case for disposition of the bond.