Robert L. GAULT, Plaintiff–Respondent,

v.

Lester BAHM and Beverly Bahm Defendants–Appellants Third–Party Plaintiffs–Appellants.

v.

Marylyn GAULT, Third–Party Defendant–Respondent.

No. 17491.

Missouri Court of Appeals, Southern District, Division Two.

March 25, 1992.

William E. Stoner, Springfield, for defendants-appellants.

Kenneth F. Thompson, Haymes, Sims and Thompson, Marshfield, for plaintiff-respondent.

James D. McNabb, Marshfield, for Third-Party defendant-respondent.

SHRUM, Presiding Judge.

The trial court determined that the plaintiff, Robert L. Gault (Robert), and his ex-wife Marylyn Gault (third-party defendant), have an easement acquired by prescription entitling them to use a road along the south boundary of land owned by the defendants, Lester and Beverly Bahm. The defendants appeal from that judgment. By Points I and II they urge that the Gaults failed to prove that the defendants knew or were given notice during the prescriptive period that the Gaults' use was adverse and under a claim of right. In Point III they contend the trial court erred because of its failure to limit the scope of the easement.

We affirm.

FACTS

The defendants own tract "A". It is the SW ¼ of the SW ¼ of Section 28, Township 29, Range 19, acquired by the defendants in June 1967 and the SE ¼ of the SW ¼ of Section 28, Township 29, Range 19, purchased by them on August 14, 1963. "White Oak" county road runs north and south through the SW ¼ of the SW ¼. The disputed road is a 30-foot wide easement by prescription found by the trial court to exist along the south side of part of tract "A". The easement runs easterly from White Oak Road to a point 20 feet east of the west line of the SE 1/4 of the SW ¼ of Section 28. The trial court found that the easement serves Marylyn's tract "C"[1] and Robert's tract "B".[2]

The Gaults derived title to their respective tracts as follows. Robert bought the W ½ of the NE ¼ of Section 33 from Sayers in October 1959. Robert and Marylyn bought that part of the SW ¼ of the SE ¼ of Section 28 that lies west of highway PP from Comptons in 1977. They sold the north part of the latter parcel but retained the south portion. In March 1983 when Robert and Marylyn were divorced, Robert received the foregoing tract "B". Tract "C" was acquired by Robert and Marylyn from Sam Phillips on May 12,

---

1. Tract "C" is the NE ¼ of NW ¼ of Section 33, Township 29, Range 19, in Webster County, Missouri.

2. Tract "B" is the W ½ of NE ¼ of Section 33 and part of S ½ of SW ¼ of SE ¼ of Section 28, Township 29, Range 19, in Webster County, Missouri.

1972. It was awarded to Marylyn in their divorce.

In 1988 the plaintiff Robert sued the defendants seeking a declaratory judgment that he was entitled to an easement by prescription over the disputed road by reason of his open, visible, continuous, notorious, and adverse use of the road for more than ten years. In addition to their answer the defendants filed a third-party claim against Marylyn and a counterclaim against Robert seeking a declaration that there was no easement across tract "A" to serve tracts "B" and "C". The defendants assert that no easement exists because (a) use of the disputed road by Robert and Marylyn has been with the permission of the defendants, and (b) the defendants withdrew their permission and erected gates in the road before the Gaults used the road for ten continuous years.

Evidence concerning the history of the use of the disputed road was contradictory. Some witnesses recalled open and uninterrupted use of and travel over the road extending back to the 1940's.[3] The plaintiff Robert testified he first knew of the road in 1956 and traveled it occasionally from 1956 until May 1972. In May 1972 he and his family began living on tract "C" and thereafter he, his family, and all others who had occasion to visit tracts "B" and "C" used the disputed road as their access. In 1978 Robert and Marylyn built a new house on tract "B" and moved into it. They built a driveway to serve the new house. The new driveway led westerly from the new house across Tracts "B" and "C" to reach the disputed road. Upon occupying the new house, they rented the tract "C" house to various tenants. Both

Robert and Marylyn denied asking or receiving permission from the defendants to use the road and denied that a gate was ever across the road between May 1972 and late 1987. In 1982 Robert moved to Georgia. Marylyn continued to live on tract "B" until May 1983.

The defendants' evidence included the following. When they bought the east 40 acres of tract "A" in 1963, what is now the disputed road was "just a path where the cows had run." It was impassable for motor vehicles because of brush, trees, and deep gullies. The defendants built the disputed road after they moved to tract "A". They also made a road down to Sam Phillips' house (now Marylyn's house on tract "A") so they could haul water from Phillips' spring. Although admittedly unfamiliar with the area before 1963, the defendants testified that after they moved onto tract "A" there was no travel over their farm by others until they built the disputed road. One of the defendants' predecessors in title, Jack Morris, also testified that in the early 1960's the disputed road had trees, brush, and gullies in it.

The defendants testified that at the time they "made" the road they gave Sam Phillips permission to use the disputed road and that such permission continued until Phillips sold tract "C" to the Gaults and moved away in 1972. Both defendants admitted that after the Gaults moved onto tract "C" in May 1972 the disputed road was used by the Gaults continuously, but Lester testified he gave Robert permission to use the road soon after the Gaults moved onto tract "C".

The defendant Lester testified that after 1978, when the Gaults had tenants on tract

---

**3.** Persons so testifying included: (a) Clarence and Amy Yandell (lived within sight of disputed road from 1945 to 1978 and testified as to its use); (b) George Sayers (Robert's predecessor in title to Tract "B"; regularly used the disputed road from 1949–60); (c) W.A. Miller (knew disputed road for 55 years; used the road "a lot" when he "was a boy"; early travel was by horseback, buggy, wagon and cars); (d) Phil Ewing (knew the Gault property "40 or 50 years"; walked the disputed road for four years in mid–

1940's to catch bus; saw motor vehicle traffic on the road over the past 40 years); (e) Glenn Wilkerson (a predecessor in title to the defendants' property; familiar with the disputed road for 40–50 years; remembered the road as being "open to the public for ever who needed it at any time"); and (f) Dale Galloway (age 57; traveled road "as a kid" and also later; as employee of special road district between 1961–62 and 1976 he occasionally graded and cleaned snow off the disputed road).

"C", he gave the tenants permission to use the road. Of the three tenants who testified, two rented the property after May 1983. Carla Graham, who rented in June 1983, talked with the defendant Lester about the road in May 1983. She "didn't specifically ask" permission but Lester told her, " '[a]s long as you're good neighbors it's okay.' " Gene Briesno, who rented tract "C" from May 1985 to April 1988, secured permission from Lester to use the road before he moved in. The third tenant, James Mingus, rented the tract "C" house from May to November or December 1981. Mingus testified that after he moved in, during a conversation with the defendant Lester, he was told that "it was okay" to use the road.

The defendants testified they erected and maintained a locked gate across the road from February 15, 1982, to March 24, 1982, at which time the gate was torn down by persons unknown. The defendant Lester testified that they did this because he knew the Gaults were approaching ten years of use and he was concerned about their "adverse use." They also testified that at various other times after 1963 there had been other wire gates and wire gaps across the road. Such evidence of gates and interrupted use was denied by the Gaults.

Among its specific findings, the trial court found that the Gaults' use of the road from 1972 through 1983 was not pursuant to any permission granted by the defendants, that the defendants did not close and lock any gate across the road from February 15, 1982, to March 24, 1982, and that the usage of the roadway by the Gaults from May 1972 until late April or early May 1983 gave rise to a prescriptive easement to serve tracts "B" and "C".

## DISCUSSION AND DECISION

▮ A prescriptive easement is created by (a) an adverse use, (b) that is continuous and uninterrupted, (c) for the period of prescription.[4] *Cramer v. Jenkins,* 399

S.W.2d 15, 17 (Mo.1966); *Johnston v. Bates,* 778 S.W.2d 357, 361 (Mo.App.1989). The foregoing elements have been "refined and amplified where necessary by reason of issues raised in individual cases." *White v. Ruth R. Millington Living Trust,* 785 S.W.2d 782, 784 (Mo.App.1990). The defendants cite *Roberts v. Quisenberry,* 362 Mo. 404, 242 S.W.2d 26 (1951), to support their argument that the servient owner must have knowledge of the adverse character of the use and knowledge that the use is being made under a claim of right.

> The four essential facts ... to prove ... an easement by prescription are, first, user for the prescribed period; second, that the user was adverse; third, that it was under a claim of right; and fourth, *notice to the owners* of the user, and *of its character and of the claims of right.*

*Id.* 242 S.W.2d at 28 (emphasis added).

In both Points I and II the defendants claim the trial court erred because there was insufficient evidence to find or infer notice to the defendants that the Gaults' use of the road was adverse and under a claim of right. Specifically, their Point I argument is that "there is no evidence from which any inference could be drawn that there was ... notice" to the defendants of the character of the Gaults' use and their claim of right.

Their Point II argument focuses on the defendant Lester's testimony that in 1963 he gave the Gaults' predecessor in title permission to travel the road. Referring to that testimony, the defendants argue that the trial court ignored the "indisputedly permissive use by the predecessor in title ... and failed to require proof that the alleged servient landowner had notice that the character of the use had changed from permissive to adverse."

▮ Quoting with approval 28 C.J.S. *Easements* § 12, p. 647 (1941), our supreme court has said:

4. The period of prescription in Missouri is ten years. § 516.110, RSMo 1986.

[F]or a user to ripen into a prescriptive right it must not only be under a claim of right, ... but must also be with the knowledge and acquiescence of the owner of the servient tenement, as such acquiescence is the foundation of the right by prescription.... *This statement, so far as it relates to the question of knowledge, implies either actual knowledge, or a user on the part of claimant of such a character that knowledge will be presumed ....*

*Zinser v. Lucks,* 361 Mo. 671, 235 S.W.2d 844, 849 (1951). A servient owner's knowledge, actual or presumed, that another is using his property under a claim of right must be shown. This because a "[u]ser cannot be claimed to be adverse if the owner could not have protested because ignorant that any right was claimed." 2 Thompson on Real Property, *Easements* § 341, p. 203 (1980 Replacement). Adequate notice to the potential servient owner of the adverse character of the use and the claim of right alerts him of the need to protect himself against the effect of the use. *Johnston,* 778 S.W.2d at 362; *Auxier v. Holmes,* 605 S.W.2d 804, 809 (Mo.App. 1980).

■ This record contains evidence from which the trial court could infer that the defendants were not ignorant of the rights claimed by the Gaults and their predecessor in title. This is found in the defendant Lester's testimony which follows.

Q. (To Lester) ... Did anything unusual happen in February of 1982?

A. Yes.

Q. And what was that?

A. Well, I put a gate in the bottom of my driveway.

Q. A closed gate?

A. A closed gate. And locked it.

Q. Why?

A. To stop the traffic because—to keep people from using it continuously for ten years.

Q. And where did you get the idea that you needed to do that? I mean, how did you know ten years?

A. Well, I remember exactly the day they moved in and I kept track exactly so that they wouldn't go over a ten-year period.

In earlier testimony Lester said that he remembered that the Gaults moved onto the Sam Phillips place in June 1972. He also recalled moving Phillips to Cassville on April 15, 1972, because Phillips sold his place to the Gaults and had to vacate by that date.

Q. (To Lester) And when did you lock the gate in '82?

A. February 15th of 1982.

Lester testified that the locked gate remained in place until March 24, 1982, when it was torn down. He explained his ability to recall the exact dates as follows:

Q. (To Lester) Did you make any notations or take any pictures or do anything to preserve the fact that you put a gate in this road to stop prescriptive easement or adverse easement?

A. There was already a gate there.

Q. You mentioned a 39–day period.... [D]id you write down some notes or do something so that you could remember that?

A. Yes, I did. I wrote down in a notebook at home when I closed it.

Q. You were keeping a notebook about this?

A. Yes I was.

Q. And when did you first start that notebook.

A. I think it was dated back in 1966 or '67.

Q. And in that notebook did you mark or describe the gates and the condition of this road?

A. Yeah, I think it's wrote down in there.

Q. *And was the purpose of this notebook your concern that somebody might claim adverse possession?*

A. *Yes.* It's a farm record book and I keep records of it. As a matter of fact,

I had them out in a cave and it's kind of deteriorating pretty bad, but you can still see the records.

Q. *So all during this period of time or from the beginning you were concerned about adverse use, is that right?*

A. *Yes, that's right I was.*

Q. Now did you make any notations about your granting permission to anyone?

A. No. (Emphasis added)

From the foregoing testimony by Lester, the trial court could certainly infer that the defendants had knowledge of the adverse nature of the user as early as 1966 or 1967. Knowledge that the Gaults' use of the road was adverse to the defendants is equally inferable to Beverly because statements made by one co-owner (Lester) concerning adverse or permissive use may be considered against other co-owners (Beverly). *Miller v. Berry*, 270 S.W.2d 666, 670 (Mo.App.1954). Such evidence of the defendants' actual knowledge of (a) the adverse character of the use and (b) the claim of right to the use, plus continuous and uninterrupted use for the prescriptive period suffices to prove an easement by prescription. *Roberts*, 242 S.W.2d at 28; *Zinser*, 235 S.W.2d at 849; 28 C.J.S., *Easements* § 12, p. 647.

The impact of Lester's admissions are not lessened by the fact that the trial court disbelieved the defendants' testimony that they had closed and locked a gate across the road from February 15, 1982, through March 24, 1982. The defendants' gate-closing evidence was contradicted by the Gaults and by other witnesses. On the other hand, Lester's testimony that he had an ongoing concern about adverse users of the road was uncontradicted. As a trier of fact, the trial court has leave to believe or disbelieve all, part or none of the testimony of any witness. *Thornbrugh v. Poulin*,

679 S.W.2d 416, 418 (Mo.App.1984). And, although the trial court made no specific fact finding regarding the defendants' knowledge of the adverse user, Rule 73.-01(a)(2) directs that "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." The inference that Lester had knowledge of the adverse character and claim of right that can be drawn from his testimony plus proof of continuous and uninterrupted use for the prescriptive period supports the trial court's finding of a prescriptive easement. Points I and II have no merit.

An additional reason exists for rejecting the arguments in Points I and II. The Gaults introduced substantial evidence of their open, visible, continuous, and uninterrupted use of the road for the statutory period. There was nothing in the Gaults' evidence from which it could be inferred or found that the origin of their use or the nature of their use was permissive.[5] Robert and Marylyn testified that they used the road for more than ten years with the knowledge of the defendants without seeking the defendants' permission and without being given permission to use it.

The trial court specifically found that the Gaults had shown a continuous, uninterrupted use of the roadway in question for the prescriptive period. The evidence supports that determination. When such use is proven, an inference or presumption arises that the use is adverse, and the proof of long and continued use without evidence to explain how it began raises the inference it was adverse under a claim of right; the burden is then cast on the subservient landowner to show that it was by virtue of some license or permission. *Fassold v. Schamburg*, 350 Mo. 464, 166 S.W.2d 571, 572 (1942); *Johnston*, 778 S.W.2d at 362; *Gill Grain Co. v. Poos*, 707 S.W.2d 434, 437 (Mo.App.1986); *George v.*

---

5. *See, e.g., Lawless v. Sears, Roebuck & Co.*, 555 S.W.2d 79, 81 (Mo.App.1977), and *Bridle Trial Association v. O'Shanick*, 290 S.W.2d 401, 406 (Mo.App.1956), cases where easement was de- nied, despite long and continued use, because some of the evidence of the person asserting the easement showed that the origin of his use or the nature of his use was permissive.

*Dickinson*, 504 S.W.2d 658, 663 (Mo.App. 1974).[6]

Here, the defendants attempted to meet their burden and overcome the presumption of adverse use by offering evidence that the Gaults' use of the road was permissive in origin and nature. One prong of that attempt is found in Lester's testimony that he gave Robert Gault permission to travel the road and later gave some of the Gaults' tenants permission. Robert denied having any such conversation with Lester and denied seeking or being granted permission to use the road. The trial court disbelieved Lester's testimony on that issue and made a specific finding to that effect.[7] We are bound by that determination. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976); Rule 73.01.

As regards the alleged permission to the Gaults' tenants, it is well established that a request for permission to cross the land of another does not obliterate a vested prescriptive right. *Speer v. Carr*, 429 S.W.2d 266, 269 (Mo.1968); *Spence v. Wrobleski*, 603 S.W.2d 91, 93 (Mo.App.1980). Any evidence that tenants made requests for permission to use the road after May 1983 has no probative value. This because the trial court's determination that the easement vested before that date is supported by substantial evidence. Permission sought after vesting of the easement has no effect. We also observe that permissive use of the claimed roadway by one person (here a tenant) would not foreclose another (here the Gaults) from acquiring a prescriptive easement by adverse use. *Miller*, 270 S.W.2d at 670; 28 C.J.S. *Easements* § 14d.(1), pp. 655–656. This is especially true where, as here, the evidence supports a finding that (a) the Gaults continued in their adverse use of the

road without knowing of the alleged permission extended to their tenants, and (b) no relationship existed between the Gaults and their tenants from which such knowledge could be inferred or imputed.

Finally, we observe that all the testimony touching upon Lester's granting permission to the tenants was conclusionary in nature. The trial court is not required to believe any particular witness even if the testimony is uncontradicted. *Terre Du Lac, Inc. v. Fuhrmeister*, 753 S.W.2d 4, 5 (Mo.App. 1988).

The defendants' additional effort to show that the Gaults' use was permissive in nature came from Lester's testimony that he gave Sam Phillips permission which was never withdrawn. That testimony was uncontradicted. At the time of trial Phillips was deceased. The trial court made no findings regarding the issue of permission to Phillips. The defendants, in Point II, urge that the trial court erred because it "[i]gnored the indisputably permissive use" by Sam Phillips and then failed to require proof the defendants had notice that the character of the use had changed from permissive to adverse. That argument is faulty for two reasons.

First, it ignores Lester's testimony that as early as 1966 or 1967 he was sufficiently concerned about adverse users that he began keeping a written record of his observations of the road. That hardly bespeaks a permissive use by Sam Phillips after 1966 or 1967. If permission was ever given to Phillips, the trial court could have permissibly inferred that Sam Phillips did something in 1966 or 1967 that warned Lester that Phillips's use of the road had turned into an adverse use under a claim of right. Otherwise, Lester had no cause for concern about a permissive use and had no

---

6. The inference arises from proof of long and continued use because in essence, a claim of right rests in intent. *George*, 504 S.W.2d at 663 n. 5.

7. Specifically, the trial court found "[t]hat by the preponderance of the credible evidence Defendant Bahm never granted permission to

Plaintiff Robert L. Gault to use said roadway," and "Robert L. Gault and those who claim under him did not use the roadway pursuant to permission granted by Defendant Bahm to Plaintiff Gault during any portion of the period from 1972 to 1983."

need to start a written record concerning the road at that early date.

■ Second, the defendants' argument presumes that the trial court had to believe Lester's testimony on the Sam Phillips permission issue. That is incorrect. The trial court, being in the best position to judge the credibility of witnesses, is not required to believe any particular witness even if the testimony is uncontradicted. *Terre Du Lac Inc., Inc.*, 753 S.W.2d at 5; *Thornbrugh*, 679 S.W.2d at 417. That is especially true where, as here, the trial court made numerous specific fact findings on other issues that reflected adversely on the defendant Lester's credibility. The facts must be taken in accordance with the result reached. *Tadlock v. Otterbine*, 767 S.W.2d 366, 370 (Mo.App.1989). The result reached indicates the trial court found (a) no permission was given to Phillips, or (b) the defendants did have notice that Phillips's use had changed from permissive to adverse.

■ Testimony of permissive use that is not believed does not cause the inference or presumption of adverse use to vanish. *Meyer v. Pierce*, 753 S.W.2d 79, 80 (Mo. App.1988); *Moravek v. Ocsody*, 456 S.W.2d 619 (Mo.App.1970). On the record presented here the presumption that the use by the Gaults was adverse and under a claim of right stands. *Mead v. Thomas*, 464 S.W.2d 1, 5 (Mo.1971). The defendants did not meet their burden of proving that the Gaults' use was permissive in origin or nature. The presumptive elements plus the proven elements establish a prescriptive easement. *Meyer*, 753 S.W.2d at 80. We reject Points I and II for these additional reasons.

In Point III the defendants argue that the trial court erred in failing to limit the use of the easement for Robert's tract. They urge the limitation because throughout the prescription period there was an occupied house on Marylyn's tract but the new house on Robert's tract, which was built near the middle of the prescription period, in 1978, and, so, was not served by the road throughout the prescription period. The substance of their argument is that any usage to serve Robert's land before 1978 was for agricultural purposes; the residential usage to serve his land occurred only from 1978 to 1983. From the foregoing they contend that the easement should be limited to Marylyn's tract or should be limited to agricultural use only for Robert's tract. We find this argument to be without merit.

It is well established that the character and extent of a prescriptive easement is determined by the character and extent of the user during the prescriptive period. *Riggs v. City of Springfield*, 344 Mo. 420, 126 S.W.2d 1144, 1149 (banc 1939), 122 A.L.R. 1496 (1939); *Tadlock*, 767 S.W.2d at 368; *Orvis v. Garms*, 638 S.W.2d 773, 777 (Mo.App.1982). In *Orvis* the disputed easement was used during the prescriptive period for ingress and egress to a property devoted to residential and agricultural use. However, the road served one house only during the prescriptive period. Later, after the prescriptive period, a mobile home for an additional family was added to the dominate property. We recognized in *Orvis* that at least two tests exist to determine what is a prohibited additional use of an easement.

■ First, if an additional use sought to be made represents only a change in degree, as respects the original use made of a way by prescription, it is not improper, but if it represents a change in quality it is impermissible. *Id.* at 778 (citing Annotation, *Extent of, and Permissible Variations in, Use of Prescriptive Easements of Way*, 5 A.L.R.3d 439, 449, § 6 (1966)). *See also* Annotation, *Scope of Prescriptive Easement For Access (Easement of Way)*, 79 A.L.R.4th 604, 622, § 8 (1990).

A second test is "whether or not the proposed use will cause a substantial new burden on the servient estate. *Firebaugh v. Boring*, 288 Or. 607, 607 P.2d 155 (1980)." *Orvis*, 638 S.W.2d at 778. This

court found it unnecessary in *Orvis* to adopt either of the two tests. We held that because the easement was acquired by use for agricultural and residential purposes during the prescriptive period, it encompassed the use of the subsequently added mobile home as a residence. *Orvis*, 638 S.W.2d at 777–78.

■ The record in this case compels the same result. During the prescriptive period the road was used for ingress and egress to the Gaults' residential dwelling and to their agricultural land for all those purposes which a person would use a roadway to their home and farm, e.g., personal access, access of service and delivery vehicles, and for the visitation of friends and relatives. The use of the road by the Gaults upon completion of the new house was of the same character and for the same purposes, i.e., ingress and egress to a residential dwelling and agricultural land. *See Burns v. Goff*, 164 W.Va. 301, 262 S.E.2d 772, 775 (1980). This record does not support a determination that there was any change in the quality of the use of the road which resulted from the construction of the new house nor does it support a determination that the building of the new house cast a "substantial new burden on the servient estate." As in *Orvis*, we need not adopt either of the two tests. We hold that the easement encompassed both Robert and Marylyn's property for residential and agricultural purposes.

We affirm the judgment.

FLANIGAN, C.J., and MONTGOMERY, J., concur.